ADVANCE SOLVENTS & CHEMICAL CORP. *v.* UNITED STATES (No. 4549) [1]

United States Court of Customs and Patent Appeals, February 10, 1947

*Eugene R. Pickrell* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

*John G. Lerch*, amicus curiae.

[Oral argument December 11, 1946, by Mr. Pickrell, Mr. Lerch, and Mr. Weeks]

[1] C. A. D. 358.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, C. D. 992, overruling the protest of appellant against the classification by the Collector of Customs at the port of New York, under paragraph 31 (b) (1) of the Tariff Act of 1930, of a cellulose compound known as Tylose imported from Germany.

The paragraph reads as follows:

PAR. 31. (b) All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:

(1) In blocks, sheets, rods, tubes, powder, flakes, briquets, or other forms, whether or not colloided, not made into finished or partly finished articles, 40 cents per pound, except that transparent sheets more than three one-thousandths of one inch and not more than thirty-two one-thousandths of one inch in thickness shall be subject to duty at the rate of 45 cents per pound;

The goods were entered April 17, 1939, and liquidation was made January 9, 1940. The protest, dated January 22, 1940, claimed the merchandise to be properly dutiable as "* * * glue, * * * not specially provided for * * *" under paragraph 41 of the act or as "* * * synthetic gums and resins not specially provided for * * *" under paragraph 11. On October 28, 1942, the protest was amended additionally to claim classification of the goods as a dextrine substitute under paragraph 84 which reads as follows:

PAR. 84. Dextrine, made from potato starch or potato flour, 3 cents per pound; dextrine, not otherwise provided for, burnt starch or British gum, dextrine substitutes, and soluble or chemically treated starch, 2 cents per pound.

The case was tried on January 5, 1943, and, upon motion of appellant's counsel, the record in *General Dyestuff Corp.* v. *United States* (protest 21454–K) was incorporated therein.

That case involved merchandise identical with Tylose and its classification by the collector was the same as that applied to the instant merchandise. Entry was made May 18, 1938, and liquidation followed on October 25, 1939.

The importer, represented by the same counsel as appears herein, filed a protest dated December 12, 1939, claiming the goods to be properly classifiable as glue not specially provided for. The protest was amended November 2, 1940, claiming the merchandise to be alternately properly classifiable as synthetic gums and resins not specially provided for. The trial began on December 2, 1940, and after some evidence was heard was continued until February 20, 1941. On that date both sides submitted and briefs were ordered filed. Subsequently at a time not appearing in the record the pro-

test was abandoned by the plaintiff before decision and judgment dismissing the suit was rendered May 28, 1942.

We have set out the various dates so it may appear that within the relatively short period of time between the date of entry of the goods in the incorporated case to the date of trial in the case in chief, counsel for appellant apparently was not quite certain under which of the claimed paragraphs the cellulose ether was properly classifiable.

The only difference between the issue in the incorporated case and the case in chief is that in the former no claim was made for classification as a dextrine substitute.

The evidence of the plaintiff in the incorporated case was offered to prove that the merchandise was chiefly used as a glue or gum or resin, as claimed, on the theory that in both of those claims the doctrine of chief use was more specific than the paragraph under which it was classified.

It was stipulated in the incorporated case that the importation was a cellulose ether produced by methylating natural cellulose.

Tylose is a trade name and in the record is variously referred to as colloresin, methyl cellulose and Methocel. It is a white, dry, fibrous substance and in order to be fitted for use is made into solutions of different strengths.

But one witness, employed as chief chemist by appellant, testified to sustain its contention that Tylose is a dextrine substitute. Five witnesses appeared for the Government whose testimony contradicted that contention. The Government produced witnesses who were either highly qualified technically or experienced in the commercial manufacturing and selling of cellulose ether and dextrine or both.

In the incorporated case, four witnesses, including the one heretofore mentioned, testified for the importer and seven for the Government. All of those witnesses appeared to be well qualified.

The trial court in its decision herein held that appellant had not established by a preponderance of the evidence that the chief use of Tylose is either as a glue or a synthetic gum and therefore overruled the protest with respect to those claims. The court further overruled the protest with respect to the claim that the imported merchandise is a dextrine substitute basing its holding principally upon the legislative history of paragraph 84 and holding that that paragraph, under the doctrine of *ejusdem generis*, is limited to starches and modifications thereof, thus excluding Tylose from classification thereunder.

The court was of opinion that the evidence disclosed a great number of uses for Tylose as a glue, a gum and a substitute for dextrine "* * * rendering it virtually impossible, even were use the controlling factor, to determine on this record which, if any, is the chief use." The court concluded that appellant had failed to establish

the classification of the collector to be erroneous and that it had not sustained any of its claims.

Appellant contends here, as it did below, that the provisions in the paragraphs under which it claimed are those of use, but since its contention as to chief use of the merchandise is limited in its brief to a dextrine substitute, it will not be necessary to review the testimony with respect to use as a glue, synthetic gum or a resin for the reason that where classification is proper under the doctrine of chief use, the determination must be made by proof of such use. *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472; *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835.

The record discloses that dextrines are made from starch by means of heat treatment in the presence of hydrolyzing agents and have no definite or fixed chemical composition. They are products between starches and sugars.

Appellant's single witness in the case in chief testified that dextrines are used "* * * as paper adhesives in coatings, as thickening agents for dyestuffs, printing pastes, as textile sizings, and as binders for pigments for special purposes, and as protective colloids in emulsions."

In the incorporated case the same witness testified that he had used Tylose "* * * in water solutions as a sizing, for the preparation of fibrous wallboards, for painting. I have used it in water solution as an emulsifying agent for petroleum oils and paraffin wax. I have used it in water solutions as a thickening agent for rubber latex; in water solution as an agent to cause rubber latex to cream; in water solution it has been used in our laboratory to stabilize, or serve as a protective colloid in artificial rubber dispersions, and for the same purpose in paraffin wax emulsions. That is the extent of my experience." It may be noted that the uses there given by the witness for Tylose were all intended to prove that it was chiefly used as a gum, resin or glue and not as a dextrine substitute. There was no other issue in that case. It may be further noted that the uses the witness gave for dextrines do not parallel those he gave in the incorporated case for Tylose except possibly as a protective colloid in emulsions of paraffin wax.

The witness's experience as to the uses of dextrine was practically entirely confined to laboratory experiments. He said he had something to do with the sale of Tylose but had never sold dextrines, which he stated he had purchased solely for experimental purposes. With respect to the use of both substances in emulsions, he admitted that Tylose may not produce the same result in a given emulsion as a like amount of dextrine. The only specific emulsion he testified to in which sub-

stantially the same results were said to be obtained was in an experiment concerning which he stated he produced an aqueous emulsion of enamel consisting of ground pigments "* * * in an oleo-resinous varnish emulsified with triethanolamine oleate as the emulsifying agent." To that emulsion he said was added the same percent by weight of the solid content of white dextrine and of methyl cellulose. He stated this experiment was made between the time the incorporated case was tried and when he testified.

The witness evidently did not know of such use when the incorporated case was tried because he gave no such testimony there. While he testified that dextrine might be used in the binding of match head material he had never used it for such purpose and based his statement upon what he said he had read "* * * in the literature."

The witness had never known dextrine to be used commercially for binding pigments in paint but did know that Tylose was used for that purpose. He had no personal knowledge of any commercial use of dextrine as a binder. He had seen dyestuff pastes which he was told, but did not know, had been thickened with dextrine and in the incorporated case he stated that instead of Tylose, natural gums such as tragacanth, arabic and locust bean may be used in place of Tylose for that purpose.

The witness gave no testimony concerning the use of dextrine as a protective colloid except in the instance of the emulsion heretofore mentioned. His experience in the use of dextrine as a stiffener for textiles or a thickener for dye pastes was entirely in the laboratory where he said he had made pastes of a dispersion in water of certain chrome yellows using Tylose as a thickening agent and also using dextrine for the same purpose wherein he said equally satisfactory results were obtained.

The witness conceded that in the uses to which he testified he did not always get the same results in the use of dextrine and Tylose. He admitted that because there are so many different grades of dextrose and Tylose, it was very difficult to say that any grade of the former is equivalent or exactly similar to any grade of the latter.

All of the five witnesses for the Government in the case in chief flatly contradicted the testimony of appellant's witness, who stated that Tylose could be interchangeably used with dextrine, and gave what appeared to be sound reasons for their conclusions.

The witnesses for the Government compared the physical and chemical properties of the two materials and gave much testimony as to their uses. It was shown that methyl cellulose, after having been thoroughly wetted in boiling water and continuously stirred and cooled to 10° C., resulted in a smooth, homogeneous solution.

As the solution was heated the viscosity thereof decreased until suddenly it became a stiff jelly. The dextrines were shown as needing only to be stirred in cold water and when the solutions were heated viscosity decreased but they did not jell. The jelling of methyl cellulose solutions was said to be a unique property of that substance which makes it different from other water soluble colloidal materials. It appears that jellied methyl cellulose solutions may be reduced in viscosity by cooling and stirring, but heated dextrine solutions on cooling increase in viscosity and that the great difference in the viscosity between those solutions made their adaptability for use widely different.

It was further shown by witnesses for the Government that when used as adhesives the properties of the two substances are materially different for the reason that much more water has to be evaporated from the methyl cellulose solutions than from the dextrine solutions. The evaporation of the former, of course, would take more time and since it appears that modern adhesive operations are conducted by machines running at great speeds, the drying problem is important.

It was further shown that methyl cellulose solutions tend to feel dry to the touch and have not the stickiness or tackiness of concentrated dextrine solutions and, therefore, cannot be expected to be useful in replacing dextrine as an adhesive or in any other manner where it is desired to obtain high viscosity solutions at a solid content.

It appears that methyl cellulose solutions are indicated for use as thickening agents by reason of their thickening properties in low solids content. This was said by the witnesses for the Government to be a use in which dextrine is not employed.

The testimony on behalf of the Government as to the use of the imported merchandise as a dextrine substitute may be summarized by stating that in chemical and physical properties and also in commercial use, even though Tylose may have some of the properties of dextrine, it cannot be considered as a substitute therefor. The two substances are not interchangeable in most respects; they are not competitive and therefore we fail to see, as far as this case is concerned, how the imported merchandise can be properly classified as a dextrine substitute.

On the entire record appellant has shown, viewing its testimony in the most favorable aspect, that the imported merchandise has adhesive properties; that it may be used under some circumstances as a glue, in some as a gum or resin and in some other minor respects in the same way that dextrine is used. That is far from sustaining its burden of proof that Tylose is a substitute for any one of the substances in the paragraphs under which it claims.

It is clear that the Congress distinguished for tariff purposes glue,

synthetic gums and resins, dextrine substitutes and cellulose ethers. Each of those materials is in a different paragraph and assessable at a different rate. Under appellant's protest, in order to prevail, it was necessary to establish that the imported merchandise, under the doctrine of chief use, must be more specifically provided for in one of the claimed paragraphs other than as classified. Therefore, it would be absurd to state that in a tariff sense Tylose is a glue, a gum, a resin and a dextrine substitute.

The imported merchandise being a cellulose ether is one of "all compounds of cellulose * * *" and therefore provided for *eo nomine*. *United States* v. *Hillier's Son Co.*, 14 Ct. Cust. Appls. 216, 222, T. D. 41706; *Rudolph Schick* v. *United States*, 34 C. C. P. A. (Customs) 95, C. A. D. 348.

Appellant has not proved by a preponderance of the evidence that under the doctrine of chief use Tylose can be properly classifiable under any of theclaimed paragraphs.

It will not do to lay down the rule that a substance which might be used in some respects only for another substance should be held, in a tariff sense, to be a substitute for the last-named substance.

The word "substitute" surely means that some thing or body takes the place of some other thing or body in substantially all respects and under substantially sall conditions.

In view of what ha been said we do not deem it necessary to discuss the legislative history of the involved paragraphs or to determine whether or not paragraph 84 is limited to starch and modifications thereof.

The sole issue here is whether or not, under the doctrine of chief use, Tylose is properly classifiable as claimed. Assuming, without holding that such doctrine is controlling, appellant has not established such use.

Appellant has called to our attention several statements contained in writings with respect to glue, synthetic gums and methyl cellulose and their relations to each other. While judicial notice may be taken of statements contained in books and writings on any subject under litigation, it must appear from common knowledge or from evidence in the case that such books or writings are considered as authoritative by those skilled in such subjects. In the absence of facts of which we may take judicial notice and in the absence of evidence on the subject, we are not justified in considering the writings relied upon by appellant as authoritative.

The trial court correctly held that appellant had failed to establish that the collector's classification of the goods was erroneous and that any claim of appellant was correct. Therefore, the judgment appealed from is *affirmed*.