**NATIONAL JUICE PRODUCTS ASSOCIATION, et al.,**
**Plaintiffs,**

v.

**The UNITED STATES, et al.,**
**Defendants.**

No. 85–11–01611.

United States Court of International Trade.

Jan. 30, 1986.

Collier, Shannon, Rill & Scott (Lauren R. Howard, Paul C. Rosenthal, Michael R. Kershow), Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Barbara M. Epstein, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## OPINION

RESTANI, Judge:

This case involves a United States Customs Service (Customs) ruling that country-of-origin marking requirements apply to frozen concentrated orange juice and reconstituted orange juice that contain imported concentrated orange juice for manufacturing. 19 U.S.C. § 1304 (1982 & West Supp.1985) (country-of-origin marking requirements); C.S.D. 85–47, 19 Cust.Bull. No. 39 at 21 (Sept. 4, 1985) (Ruling No. 728557). This ruling is being challenged by plaintiffs, the National Juice Products Association (NJPA)[1] and Citrus World, Inc., Coca-Cola Foods, a Division of the Coca-Cola Company, Lykes Pasco Packing Company, and TreeSweet Products, individually and as members of NJPA. Two motions are currently before the court. Plaintiffs have moved for a preliminary injunction to delay the implementation of Customs' rul-

1. The following is a list of the National Juice Products Association members of 1985–86:

Alcoma Packing Company*
Allsun Pure Juice Corporation
American Agronomics Corporation*
B.C. Cook & Sons Enterprises
Ben Hill Griffin Citrus Company
Berry Citrus Products, Inc.*
Bisceglia Brothers Wine Company
Bordo Citrus Products Cooperative
Butland Industries, Inc.
California Citrus Producers, Inc.
Cargill Citro-America, Inc.
Caulkins Indiantown Citrus Company*
Citram, Inc.
Citrus Belle
Citrus Central, Inc.
Citrus Products, Inc.
Citrus Service, Inc.
Citrus World, Inc.
Clermont Fruit Packers, Inc.
Coca-Cola Foods
CTC North America
Cumberland Farms Dairy, Inc.
Delano Growers Grape Products
Dell Products Corporation
Del Monte Corporation
Dole Processed Foods Company
Farmland Dairies, Inc.
Flavor Fresh Foods Corporation
Flavors From Florida*
Golden Gem Growers, Inc.
Grande Citrus Corporation
Great Northern Juice Company
Guild Wineries & Distilleries
Holiday Juice, Ltd.
Holly Hill Fruit Products Company, Inc.
Home Juice Company
H.P. Hood, Inc.
Imperial Flavors, Inc.
JB Food Industries, Inc.

Johanna Farms, Inc.
Juice Bowl, Inc.
Juice Farms Incorporated
Juice Services, Inc.
Knudsen Corporation
Kraft, Inc.
Libby, McNeill & Libby
Lincoln Foods, Inc.
Ludford Fruit Products, Inc.
Lykes Pasco Packing Company
MCP Foods, Inc.
New England Apple Products Company
Ohio Pure Foods, Inc.
Orange Company of Florida*
Paramount Citrus, Inc.
Paris Foods Corporation
Parman-Kendall Corporation
Peninsular Products Company
Pepsico, Inc.
Red Creek
Riverbend Products, Inc.
Seven-Up Foods, Citrus Division
Silver Springs Citrus Cooperative
Southern Fruit Distributors, Inc.
Sucocitrico Cutrale, S.A.
Sunbase USA, Inc.
Sunkist Growers, Inc.
Sun Pac Foods, Inc.
Sun Rype Products, Ltd.
Texas Citrus Exchange
The Kroger Company
The Southland Corporation
Thomas J. Lipton, Inc.
TreeSweet Products Company
Tropicana Products, Inc.
Vie-Del Company
Vita-Pakt Citrus Products Company
Volvic (France)
Washington State Juice
Zumos Argentinos, S.A.

* These members of the NJPA are not participating in this suit.

ing, or, in the alternative, for declaratory relief. Defendants have moved for dismissal of the case for lack of jurisdiction, and in the alternative, for judgment on the administrative record.

The controversy underlying this action began on January 16, 1985, when Customs national import specialist, Officer W.J. Springer of the New York Seaport, sent a directive to various Customs ports advising them of his opinion that orange juice products using the imported ingredient of concentrated orange juice for manufacturing (manufacturing concentrate) be marked to indicate foreign origin. Officer Springer's opinion was based on a recent Customs determination that found country-of-origin marking requirements applicable to processed honey. C.S.D. 84–112, 18 Cust.Bull. 1106 (July 2, 1984). In his directive, Officer Springer advised Customs officers at the various ports to notify importers of manufacturing concentrate of this contemplated change in policy.

On April 22, 1985, plaintiffs requested that Customs issue a binding ruling, pursuant to 19 C.F.R. § 177.2 (1985), as to the applicability of the country-of-origin marking requirements of 19 U.S.C. § 1304 to frozen concentrated orange juice and reconstituted orange juice that contain imported manufacturing concentrate. On September 4, 1985, Customs issued a ruling in response to plaintiffs' April 22 request. C.S.D. 85–47, 19 Cust.Bull. No. 39 at 21. Customs held that imported manufacturing concentrate is not substantially transformed in the process that converts the manufacturing concentrate into frozen concentrated orange juice or reconstituted orange juice. Consequently, Customs held that the country-of-origin certification requirements of 19 C.F.R. § 134.25 (1985) apply to final repacked orange juice products that contain any foreign manufacturing concentrate entered for consumption or withdrawn from warehouse on or after January 1, 1986. Specifically, the importer must certify to Customs either that the retail package will be properly marked with the country of origin or that the importer will notify the repacker of the marking requirements. All retail packages of orange juice subject to the ruling must be marked with either the country of origin of the manufacturing concentrate or the phrase "This product contains foreign concentrate from _____." If the product contains concentrate from more than one foreign country, the package must list all such countries. *Id.* at 28. Customs also noted that this decision overruled a 1979 ruling, C.S.D. 80–88, 14 Cust.Bull. 865 (Aug. 17, 1979) (Ruling No. 710823), which held that the reconstitution of orange juice is a substantial transformation of the frozen concentrate. C.S.D. 85–47, 19 Cust. Bull. No. 39 at 28.

In a letter dated October 21, 1985, the NJPA requested that Customs postpone the implementation date of the September 4 ruling until January 1, 1987. The NJPA based this request on the need of the domestic orange juice industry for additional time to secure packaging in compliance with Customs' ruling and to reduce existing packaging inventory. A similar request was made by the Florida Citrus Commission and the State of Florida Department of Citrus in a letter dated October 25, 1985. Customs subsequently extended the effective date of the marking ruling from January 1 to March 1, 1986. 19 Cust.Bull. No. 50 at 15 (Dec. 11, 1985).

Plaintiffs have moved for pre-importation review of the September 4 ruling, claiming that this court has jurisdiction over the matter pursuant to 28 U.S.C. § 1581(i)(4) (1982) or, in the alternative, 28 U.S.C. § 1581(h) (1982).[2] Defendant con-

---

**2.** As a preliminary matter, the court observes that § 1581(i) is the residual jurisdiction of this court. *United States v. Uniroyal, Inc.,* 69 CCPA 179, 182–83, 687 F.2d 467, 471–72 (1982); *Ass'n of Food Indus., Inc. v. von Raab,* 9 CIT ——, 624 F.Supp. 1557 (1985); *Vivitar Corp. v. United States,* 7 CIT ——, 585 F.Supp. 1419, 1424–25 (1984), *aff'd,* 761 F.2d 1552, 1559 (1985). As such, it may only be invoked when other available avenues of jurisdiction are "manifestly inadequate or necessary because of special circumstances to avoid extraordinary and unjustified delays caused by the exhaustion of administrative remedies." *Manufacture de Machines du*

tends that the court lacks jurisdiction under either of those provisions.

 Defendants argue that this case has been brought prematurely and should only be reviewable following protest proceedings under 19 U.S.C. §§ 1514 and 1515 (1982 & West Supp.1985); *see* 28 U.S.C. § 1581(a) (1982) (Court of International Trade jurisdiction following protest and denial). The customary and generally preferred avenue of review is the traditional protest route. In this case, however, currently plaintiffs cannot pursue section 1581(a) review. C.S.D. 85–47 will not be in effect until March 1, 1986. Therefore, plaintiffs cannot import a shipment to test the ruling at this time. In addition, under certain circumstances a plaintiff need not complete the protest procedure before bringing a civil action. One of those circumstances is when the action falls within the jurisdiction of section 1581(h).[3]

 The Court of Appeals for the Federal Circuit has defined the requirements for invoking this court's declaratory judgment jurisdiction:[4]

(1) judicial review must be sought prior to importation of goods;

(2) review must be sought of a ruling, a refusal to issue a ruling, or a refusal to change such ruling;

(3) the ruling must relate to certain subject matter; and

(4) it must be shown that irreparable harm will occur unless judicial review is obtained prior to importation.

*American Air Parcel Forwarding Co. v. United States*, 718 F.2d 1546, 1551–52 (Fed.Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984) (cited in *718 Fifth Avenue Corp. v. United States*, 7 CIT ——, Slip Op. 84–39 at 3–4 (April 13, 1984)). Since defendant challenges jurisdiction under section 1581(h), plaintiffs have the burden of demonstrating that jurisdiction exists. *718 Fifth Avenue* at 3; *Lowa, Ltd. v. United States*, 5 CIT 81, 83, 561 F.Supp. 441, 443 (1983), *aff'd*, 724 F.2d 121 (Fed.Cir.1984); *United States v. Biehl & Co.*, 3 CIT 158, 160, 539 F.Supp. 1218, 1220 (1982).

 Defendant contends that plaintiffs fail to meet two of the requirements for section 1581(h) review. First, defendant contends that C.S.D. 85–47 is not the type of ruling that can be reviewed under section 1581(h). Second, defendant argues that plaintiffs have failed to demonstrate that they will be irreparably harmed if they cannot secure section 1581(h) review.

The essence of defendant's argument regarding the type of ruling appropriate for section 1581(h) review is that C.S.D. 85–47 is insufficiently specific to be the subject of pre-importation review. The legislative history defines "ruling" as "a determination

---

*Haut-Rhin v. von Raab*, 6 CIT ——, 569 F.Supp. 877, 882–83 (1983). *Accord American Ass'n of Exporters and Importers—Textile and Apparel Group v. United States*, 751 F.2d 1239, 1246 (Fed.Cir.1985); *Uniroyal*, 69 CCPA at 187, 687 F.2d at 475 (Nies, J., concurring); *United States Cane Sugar Refiners' Ass'n v. Block*, 69 CCPA 172, 175 n. 5, 683 F.2d 399, 402 n. 5 (1982); *Vivitar*, 7 CIT at ——, 585 F.Supp. at 1425. Consequently, the two bases of jurisdiction asserted by plaintiffs must be addressed in reverse order from the priorities given them by plaintiffs. Section 1581(i) will only be a basis of jurisdiction if § 1581(h) is manifestly inadequate or otherwise entirely inappropriate.

**3.** The legislative history of § 1581(h) outlines its relationship to § 1581(a):

It is not the Committee's intent to permit judicial review prior to the completion of the import transaction in such a manner as to

negate the traditional method of obtaining judicial review of import transactions. Such review, however, is exceptional and is authorized only when the requirements of subsection (h) are met.

H.R.Rep. No. 1235, 96th Cong., 2d Sess. 47, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3729, 3758.

**4.** 28 U.S.C. § 1581(h) (1982) reads in relevant part:

The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury ... relating to ... marking ..., but only if the party commencing the action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

by the Secretary of the Treasury as to the manner in which it will treat the contemplated transaction." H.R.Rep. No. 1235, 96th Cong., 2d Sess. 46, *reprinted in* 1980 U.S.Code Cong. & Admin.News 3729, 3758. This court has interpreted "the legislative history as speaking to specific contemplated import transactions which contain identifiable merchandise and which will feel the impact with virtual certainty." *Pagoda Trading Co. v. United States*, 6 CIT —, 577 F.Supp. 22, 24 (1983). Neither of the two cases cited by defendant in which jurisdiction was denied because the action involved an inappropriate ruling apply in this case. In *Pagoda Trading* the ruling involved was a "general interpretive ruling" that contained "guidelines 'set forth as an aid to Customs officers in classifying specific footwear constructed with foxing.'" *Pagoda Trading*, 6 CIT at —, 577 F.Supp. at 23 (quoting 48 Fed.Reg. 22,910 (1983)). Likewise, in *American Air Parcel Forwarding Co. v. United States*, section 1581(h) could not be invoked because the ruling involved was an "internal advice" ruling. 5 CIT 8, 11, 557 F.Supp. 605, 608, *aff'd*, 718 F.2d 1546 (Fed.Cir.1983).[5] Although not restricted to the facts of a single case, the ruling at issue is clearly distinguishable from internal advice and general interpretive rulings. *See Association of Food Industries, Inc. (Pistachio Group) v. von Raab*, 9 CIT —, 624 F.Supp. 1557 (1985) (with regard to country-of-origin ruling pertaining to all imports of pistachio nuts, the court found the ruling "sufficiently related to a specific import transaction to obtain jurisdiction under [section 1581(h)]"). Customs based its ruling here on retail orange juice products that contain either 30 or 50 percent foreign manufacturing concentrate, and which have added ingredients for flavoring purposes. Plaintiffs represented these percentages of foreign concentrate to be standard in the industry, and plaintiffs clearly intend to produce products containing these percentages of foreign concentrate from the imported concentrate referred to in the ruling. As to such products, plaintiffs will feel the impact of this ruling "with virtual certainty." Thus, although the ruling has interpretive aspects, it is adjudicative as to the products described and is sufficiently specific to be reviewed under section 1581(h).

In this case, plaintiffs' written request sought a binding ruling pursuant to 19 C.F.R. § 177.2 (1985) of the country-of-origin marking requirements to frozen concentrated orange juice and reconstituted orange juice that contain imported manufacturing concentrate. Defendant argues that the form of the ruling at issue was not that which was contemplated by section 1581(h). In response to plaintiffs' request, however, Customs issued a ruling that it considered final.[6] The court sees no reason to distinguish among various types of final, specific rulings in determining whether pre-importation review is proper. Thus, section 1581(h) review may be had of a ruling such as C.S.D. 85–47, provided the other requirements of section 1581(h) review are met.

---

**5.** In so finding, the *American Air Parcel* court relied on legislative history that expressly dealt with the subject. "In determining the scope of the definition of a 'ruling,' the Committee does not intend to include 'internal advice' or a request for 'further review,' both of which relate to completed import transactions." *American Air Parcel* at 608, quoting H.R.Rep. No. 1235, 96th Cong., 2d Sess. 46, *reprinted in* 1980 U.S. Code Cong. & Admin.News 3729, 3758.

**6.** On August 16, 1985, prior to the issuance of Customs' ruling, NJPA sent a letter to then-Assistant Secretary of the Treasury, John Walker, requesting that the Treasury Department review any ruling issued by Customs in response to the ruling request prior to the time that such ruling was finalized. A response, written by Commissioner of Customs William von Raab, stated:

> In view of the various competing interests in this case and the significant policy questions raised, this matter was under review at the highest levels of Customs before a final decision was reached. We do not believe that additional review by the Department is warranted.

This letter was dated September 11, 1985, a week after the issuance of Customs' decision. Thus, although plaintiffs requested a ruling from the Secretary of the Treasury, defendant declined to issue one. Refusal to issue a ruling is a basis for § 1581(h) jurisdiction.

The second requirement under dispute is whether plaintiffs will be irreparably harmed if they are unable to secure pre-importation review. The essence of "irreparable injury" is that it is harm that "cannot receive reasonable redress in a court of law." *Manufacture de Machines du Haut Rhin v. von Raab*, 6 CIT —, 569 F.Supp. 877, 881–82 (1983) (quoting *Black's Law Dictionary* 706–07 (5th ed. 1979)). In making this determination, what is critical is not the magnitude of the injury, but rather its immediacy and the inadequacy of future corrective relief. *National Corn Growers Association v. Baker*, 9 CIT —, Slip Op. 85–119 at 27 (Nov. 26, 1985) ("The possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm.") (quoting *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 952–53, 39 L.Ed.2d 166 (1975), quoting *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921, 925 (D.C.Cir. 1958)); *Haut-Rhin*, 6 CIT at —, 569 F.Supp. at 381 (irreparable injury includes an injury "whether great or small"); *S.J. Stile Associates v. Snyder*, 68 CCPA 27, 30, 646 F.2d 522, 525 (1981) (to demonstrate irreparable harm "[a] presently existing, actual threat must be shown"); *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 755 (2d Cir.1977) (alleged threats of irreparable harm cannot be remote or speculative but must be actual and imminent). Plaintiffs have asserted several grounds in support of their claim of irreparable harm. These grounds must be analyzed to determine both their legal sufficiency[7] and whether plaintiffs have offered sufficient documentation to support the claims. *718 Fifth Avenue Corp. v. United States*, 7 CIT —, Slip Op. 84–39 at 7 (Apr. 13, 1984) ("documentation is essential to establishing irreparable harm"); *Tropicana Products, Inc. v. United States*, 3 CIT 171, 174–76, *modified*, 3 CIT

240 (1982) (bare allegations, not supported by facts and figures, are insufficient).

Plaintiffs offer the following reasons to support their claim that they will suffer irreparable harm if they are unable to secure pre-importation review. First, plaintiffs maintain that their packaging suppliers will be unable to provide the necessary labels and cans by the current effective date of March 1, 1986, and that the unavailability of such packaging will result in the inability to fill orders placed by retail customers. In support of this proposition, plaintiffs offer affidavits of three packaging company representatives. These affiants estimate that the transition to packaging complying with the new ruling would take a year to two and one-half years.

As plaintiffs have noted, under the country-of-origin marking statute, Customs is required to withhold delivery of imported merchandise until it is properly marked or until proper certifications are filed. 19 U.S.C. § 1304(g) (1982 & West Supp.1985). Therefore, to the extent that plaintiffs cannot comply with Customs' ruling by March 1, 1986, they will be unable to use foreign manufacturing concentrate and will not be able to satisfy all of their customer's orders for retail orange juice products. This court has recognized that severe disruption of business operations can constitute irreparable injury under certain circumstances. *718 Fifth Avenue Corp.*, Slip Op. 84–39 at 7 ("Business disruption resulting from administrative delay could be sufficient to demonstrate irreparable harm.") (citing *American Air Parcel Forwarding Co. v. United States*, 1 CIT 293, 300, 515F. Supp. 47, 54 (1981)); *Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 242, 566 F.Supp. 1523, 1527 (1983) (potential costs required for altering plaintiff's production methods in the event that plaintiff was compelled to comply with Customs' ruling as a factor demonstrating irreparable harm). Plaintiffs have provided undis-

---

**7.** A substantial number of the cases dealing with irreparable harm have involved preliminary injunctive relief. This court has stated, however, that "[t]he standard for proving irreparable harm [in the declaratory judgment context] is essentially identical to that used to determine irreparable injury in cases where injunctive relief is sought." *718 Fifth Avenue Corp. v. United States*, 7 CIT —, Slip Op. 84–39 at 4 n. 3 (Apr. 13, 1984).

puted documentation of the possibility of significant disruption of their business operations that will result if they are required to comply with the ruling.

Plaintiffs' second argument is that they will be forced to discard millions of dollars worth of noncomplying labels that are currently in inventory. Plaintiffs have provided documentation that demonstrates that if they are unable to secure pre-importation review they will be required to either warehouse this inventory or destroy the labels. Either way, plaintiffs will be required to expend funds that will not be recoverable should they ultimately prevail on the merits. This factor also applies to plaintiffs' third argument that they will be forced to spend millions of dollars to redesign packaging to comply with Customs' ruling. Plaintiffs support this argument with affidavits from a sampling of processors, whose estimates of their costs for new labels and packaging, even under normal conditions, proved to be substantial. These costs, also, could not be recouped if the court were to rule in plaintiffs' favor.[8]

The final consideration is whether there exists a viable temporary measure for providing the country-of-origin information without forcing plaintiffs to incur these nonrecoupable costs. The availability of such alternatives can reduce the impact of the change in the labeling and substantially mitigate the damage. *Association of Food Industries, Inc. (Pistachio Group) v. von Raab*, 9 CIT ——, 624 F.Supp. 1557 (1985). In the pistachio case, this court held that the plaintiffs failed to demonstrate that they would suffer irreparable injury if unable to secure pre-importation review. In doing so, the court stated that it was not "persuaded that the use of adhesive labels to add the country of origin is an unacceptable or impractical interim measure. This method would allow the use of current label inventories until they are depleted." *Id.* at 1559. In the present case, none of the temporary measures suggested by defendant is a feasible alternative. The first alternative, the use of adhesive stickers, although a possible solution in the pistachio case, is not a feasible alternative in this case. In the summer of 1985, Citrus World attempted to apply foreign language stickers to frozen concentrated orange juice cans. These attempts were unsuccessful because the cans are sprayed with water to wash off excess juice and the stickers will not stick to a wet surface. Similarly, Coca-Cola Foods tried to place stickers with a special cash prize offer onto their reconstituted orange juice containers. These containers, too, had wet surfaces and the stickers would not adhere to them. The evidence also shows that even if the stickers would adhere to the containers there is no guarantee of accurate placement of the stickers on the containers. The random placement of the stickers, which are blown from machines, could obscure existing text. Some of this information, such as product identity, net weight, and distributor's address, is required by the Federal Food, Drug & Cosmetic Act, 21 U.S.C. § 343(e), (f) (1982) and the Fair Packaging & Labelling Act, 15 U.S.C. § 1453(a) (1982). Other information has important commercial significance, such as brand name and the universal product coding, which enables scanners to "read" the price. Additionally,

---

8. Plaintiffs also contend that to the extent that they mark their retail packages with a designation of origin, they will be commercially disadvantaged by loss of consumer acceptance of these products. Injuries to reputation have been recognized as irreparable and not readily recompensed in the trademark context. *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972); *Cutler-Hammer, Inc. v. Universal Relay Corp.*, 285 F.Supp. 636, 639 (S.D.N.Y.1968). In these cases, however, the professed injuries would be the result of either a play on words or mislabeling. In this case, the labeling would be accurate, although potentially neither desirable nor required by law. Furthermore, the evidence offered by plaintiffs on this point is not conclusive. The survey conducted by Fine, Travis & Associates on Florida's Seal of Approval found that in general consumers reacted negatively to suggestions that orange juice ingredients are imported. However, the survey sample consisted of only 30 consumers and a caveat in the report cautions that the findings "are not necessarily replicable nor do they indicate how widespread a particular response may be." This factor, then, cannot be used to support a claim of irreparable harm under these circumstances.

Customs regulations require that the marking statement be in close proximity to the United States address. 19 C.F.R. § 134.-22(c) (1985). In any case, even if adhesive stickers were physically possible to apply, plaintiffs could not recoup the significant costs of acquiring the equipment and stickers.

Another alternative suggested by defendant is to lithograph the country-of-origin marking on the "ends" of the cans. This solution is also unsatisfactory. Orange juice is packaged in a variety of containers, many of which are not cans and do not have "ends" to be lithographed. Additionally, plaintiffs' exhibits demonstrate that marking of the container ends may not satisfy Customs' requirement, noted above, that the country-of-origin statement be "in close proximity" to the United States address. 19 C.F.R. § 134.22(c) (1985). The distributor's clause is generally located on the label that encircles the can, not on its end.

Defendant also suggests that plaintiffs can stockpile manufacturing concentrate imported before March 1, 1986, so that the orange juice processors can avoid the requirements of the marking ruling until their inventory is depleted and new labels can be made. Plaintiffs counter with evidence indicating that such stockpiling could be more costly to the industry than revising its labels. Undisputed evidence indicates that in the past year the price of imported manufacturing concentrate has dropped sharply and that this trend is expected to continue in the upcoming months. Affiant Steven R. Michael, representative of Ohio Pure Foods, stated that the price of foreign manufacturing concentrate dropped by thirty percent since January 1985. If U.S. processors stockpiled large quantities of imported manufacturing concentrate and the price of the commodity

continued to decline, plaintiffs would suffer a substantial financial loss.[9] Another problem with the stockpiling solution is the need for storage space to hold the concentrate. Many of the processors do not have sufficient space on their premises to permit long-term storage of large quantities of manufacturing concentrate. Although plaintiffs did not provide facts or figures as to the potential cost of such storage, it is reasonable to assume that such cost would be significant.

The final suggestion offered by defendant is that the U.S. orange juice processing industry could rely exclusively on the supply of domestic manufacturing concentrate to avoid the requirements of the marking ruling. The evidence indicates that this, too, is not a realistic alternative. In four out of the last five seasons, severe freezes have substantially diminished the availability of U.S. oranges and their by-products, including manufacturing concentrate. In his affidavit, Dan L. Gunther, director of economic research for the Florida Department of Citrus, anticipates that, as in past seasons, "U.S. orange juice demand [for this season] is expected to exceed domestic orange juice production." He also notes the necessity of mixing early-season domestic juice with late-season imported juice, because of the differences in seasons between the northern and southern hemisphere, to ensure product consistency. Given these factors, Mr. Gunther concludes that domestic processors "will not be able to use domestic manufacturing concentrate to meet total market needs during the season or even the market needs in the early part of the season." Affidavit of Dan L. Gunther. Defendants offer no evidence to refute this conclusion.

In sum, plaintiffs have demonstrated by clear and convincing evidence[10] that they

9. Lykes Pasco Packing Company illustated this point by calculating the impact of the stockpiling suggestion had it been implemented for eight months during 1985. If Lykes Pasco purchased the concentrate directly from Brazil, it would have lost $3.5 million. If the concentrate had been purchased on the futures market, the

company would have lost $6.5 million. Affidavit of Talmage G. Rice.

10. 28 U.S.C. § 2639(b) (1982) states: "In any civil action described in section 1581(h) of this title, the person commencing the action shall have the burden of making the demonstration

will suffer irreparable injury if they cannot procure pre-importation review. The cumulative impact of the factors stated by plaintiff, specifically, the business disruption likely to occur because of the inability of the industry packagers to satisfy the simultaneous demand for new labels, the cost of discarding or storing noncomplying labels, and the cost of redesigning packaging, would be substantial and none of these expenses could be recouped should plaintiffs ultimately prevail on the merits. The impact of these injuries would not be alleviated by any of the alternatives suggested by defendants. This showing of irreparable harm allows the court to execise jurisdiction under section 1581(h) and to provide, if appropriate, declaratory relief.

▮▮▮ · Because the court finds that the declaratory relief awarded under section 1581(h) is adequate in this case to address any harm to plaintiff, jurisdiction may not be invoked under section 1581(i). *See supra* note 2 and discussion, *infra*. Furthermore, injunctive relief may not be granted under section 1581(h).[11] Therefore, plaintiff's motion for injunctive relief is denied.

Having established that the court has jurisdition to review the merits of the case, the court turns to the facts at hand. A full appreciation of the controversy at bar requires an understanding of the two-step process that transforms oranges into the final retail products. The retail products involved in this case are reconstituted orange juice[12] and frozen concentrated orange juice.

The first level of production involves reducing fresh oranges to manufacturing concentrate. The oranges are tested for solid content and then run through an extractor and transferred to an evaporator, where the juice is reduced to approximately fourteen percent of its original volume and cooled. During this process, the essential oils and flavoring ingredients present in the juice also evaporate. The end result is a viscous substance with a brix level of approximately 65°.[13] Because the oils and flavoring ingredients are lost during this process, manufacturing concentrate lacks the characteristic flavor of oranges.

The second level of production involves blending this manufacturing concentrate with other ingredients (primarily water) to create an end product of either frozen concentrated orange juice or reconstituted orange juice. This process generally involves mixing the manufacturing concentrate with purified and dechlorinated water, orange essences, orange oil, and, in some cases, fresh juice. Once blended, the product is subjected to a variety of quality control and production tests. At this point, the frozen concentrated orange juice has a brix level of about 41.8°. It is then packaged in cans and frozen. Reconstituted orange juice has a brix level of 11.8°. It is pasteurized, retested, chilled, and packed in liquid form.

Section 304 of the Tariff Act of 1930, as amended, generally requires that every article of foreign origin that is imported into the United States be marked with its country of origin in such a manner that its ultimate purchaser will be aware of its country of origin. An ultimate purchaser is defined in Customs regulations as "the last person in the United States who will receive the article in the form in which it was imported." 19 C.F.R. § 134.1 (1985). Where a foreign article is subjected to manufacturing in the United States before reaching the consumer, the regulations provide some guidance as to when the manu-

---

required by such section by clear and convincing evidence."

**11.** 28 U.S.C. § 2643(c)(4) (1982) provides: "In any civil action described in section 1581(h) of this title, the Court of International Trade may only order the appropriate declaratory relief."

**12.** This product, orange juice in liquid form, is also called orange juice from concentrate.

**13.** Degree brix is a measurement of the percentage of the soluble solids (sugar) in a concentrate, as measured in air at 20° centigrade and adjusted for the acid correction of the solids. Thus, manufacturing concentrate with a brix value of 65° contains 65 pounds of fruit sugar solids in every 100 pounds of solution.

facturer will be regarded as the ultimate purchaser. A manufacturer will be considered the ultimate purchaser *"if he subjects the imported article to a process which results in a substantial transformation of the article,* even though the process may not result in a new or different article." 19 C.F.R. § 134.1(d)(1) (1985) (emphasis added). On the other hand, if the manufacturing process is "merely a minor one which leaves the identity of the imported article intact," the consumer is regarded as the ultimate purchaser. *Id.* at § 134.1(d)(2). In the former case the product is not subject to the country of origin marking statutes; in the latter the country of origin must appear on the product.

The critical question in this case is whether the foreign manufacturing concentrate undergoes a "substantial transformation" in becoming frozen concentrated orange juice and reconstituted orange juice. Customs has recently promulgated 19 C.F.R. § 134.35 (1985), which defines "Articles substantially changed by manufacture" as follows:

An article used in the United States in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision in the case of *United States v. Gibson-Thomsen Co., Inc.,* 27 C.C.P.A. 267 (C.A.D. 98). Under this principle, the manufacturer or processor in the United States who converts or combines the imported article into the different article will be considered the "ultimate purchaser" of the imported article within the contemplation of section 304(a), Tariff Act of 1930, as amended (19 U.S.C. 1304(a)), and the article shall be excepted from marking. The outermost containers of the imported articles shall be marked in accord with this part.[14]

**14.** In *Gibsen-Thomsen,* the court indicated that substantial transformation occurs when an article acquires a "new name, character, *and* use." *Gibson-Thomsen,* 27 CCPA at 273 (emphasis added). This restrictive test was modified to require a "new name, character, *or* use." *Midwood Indus., Inc. v. United States,* 64 Cust.Ct. 499, 506, 313 F.Supp. 951, 959 (emphasis added), *appeal dismissed,* 57 CCPA 141 (1970). As modified, the test is similar to the tests for whether an article is a "manufacture or product" of a given country for drawback purposes and whether an article has been "[s]ubstantially transformed in [a] beneficiary developing country into a new and different article of commerce" for duty free treatment under the Generalized System of Preference (GSP). 19 C.F.R. § 10.177(a)(2) (1985). The drawback test states that for a manufacture to occur "[t]here must be a transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" *Anheuser-Busch Brewing Ass'n v. United States,* 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336 (1908) (cited in *United States v. Patel,* 762 F.2d 784, 792 (9th Cir.1985), quoted in *Belcrest Linens v. United States,* 741 F.2d 1368, 1371 (Fed.Cir.1984) ). *Accord, United States v. International Paint Co.,* 35 CCPA 87, 93, C.A.D. 376 (1948); *Ishimitsu v. United States,* 11 Ct.Cust.App. 186, 191, T.D. 38,963 (1921). Likewise, for a substantial transformation to occur for GSP purposes, an article must "emerge from a manufacturing process with a name, character, or use which differs from those of the original material subjected to the process." *Torrington Co. v. United States,* 764 F.2d 1563, 1568

(Fed.Cir.1985) (citing *Texas Instruments v. United States,* 681 F.2d 778, 782 (CCPA 1982) ). The policies underlying the different statutes are similar but not identical. The GSP statute "represents the United States' participation in a multinational effort to encourage industrialization in lesser developed countries through international trade." *Torrington Co.,* 764 F.2d at 1565. Whereas "[t]he theory underlying the granting of drawback ... is and always has been that it would encourage the development in the United States of the making of articles for export, thus increasing our foreign commerce and aiding domestic industry and labor." *International Paint,* 35 CCPA at 90. In contrast, the primary purpose of the country-of-origin marking statute is to "mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will." (Congress, of course, had in mind a consumer preference for American made goods.) *United States v. Friedlaender & Co.,* 27 CCPA 297, 302, C.A.D. 104 (1940) (quoted in *Globemaster, Inc. v. United States,* 68 Cust.Ct. 77, 79–80, 340 F.Supp. 975–76 (1972)). *Accord, United States v. American Sponge & Chamois Co.,* 16 Ct.Cust.App. 61, 65, T.D. 42,731 (1928) (quoting *Hobe Button Co. v. United States,* 12 Ct.Cust.App. 341, 344, T.D. 40,488 (1924)). Unlike the GSP and drawback statutes, the encouragement of the advancement of the industry of particular countries is one reason underlying the country-of-origin marking statute, not the only purpose. *American Sponge,* 16 Ct.Cust.App. at 65, *Hobe Button,* 12

■ The Customs' ruling at issue involved manufacturing concentrate processed from oranges grown in foreign countries. This manufacturing concentrate is then blended with domestic concentrate. Ratios of 50/50 or 30/70 (foreign/domestic) were represented to be "common." Customs ruled that for purposes of country of origin marking, the manufacturing concentrate is not "substantially transformed" after undergoing the further processing in the United States. Under Customs' ruling, retail packages of frozen concentrated orange juice and reconstituted orange juice must be marked to indicate that the products contain foreign concentrate.

This "name, character, or use" test was applied by Customs in finding that no substantial transformation occurs in the production of retail orange juice products from manufacturing concentrate. Customs' ruling must stand unless it is shown to be arbitrary, capricious, or otherwise not in accordance with the law. 28 U.S.C. § 2640(d) (1982); 5 U.S.C. § 706(2)(A) (1982).

In its ruling, Customs addressed each of the factors, name, character, and use, in turn. Plaintiffs argued that the name change from "concentrated orange juice for manufacturing" to "frozen concentated orange juice" and "orange juice from concentrate" was significant to a finding of substantial transformation. The court agrees with Customs' conclusion that these names, derived from the FDA's standards of identity, "merely refer to the same product, orange juice, at different stages of production."[15] In any case, a change in the name of the product is the weakest evidence of a substantial transformation. *See Uniroyal, Inc. v. United States*, 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd*, 702 F.2d 1022 (Fed.Cir.1983) (fact that this imported product was called an "upper" and final product called a "shoe" did not affect the court's finding of no substantial transformation); *United States v. International Paint Co.*, 35 CCPA 87, 93–94, C.A.D. 376 (1948) ("Under some circumstances a change in name would be wholly unimportant and equally so is a lack of change in name under circumstances such as [in this drawback case].").

Customs also found that the fact that the imported concentrate is sold to producers whereas the retail product is sold to consumers does not constitute a sufficient change in character and use to render the concentrate substantially transformed. Plaintiffs rely on the *Midwood* decision, in which this court's predecessor, the Customs Court, emphasized this transition from producers' goods to consumers' goods in finding that steel forgings are substantially transformed into flanges and fittings. *Midwood Industries, Inc. v. United States*, 64 Cust.Ct. 499, 507, 313 F.Supp. 951, 957, *appeal dismissed*, 57 CCPA 141 (1970). As noted by Customs, however, the signifi-

---

Ct.Cust.App. at 344. Thus, although the language of the tests applied under the three statutes is similar, the results may differ where differences in statutory language and purpose are pertinent.

15. Plaintiffs make much of the fact that the imported and retail products at issue in this case have distinct standards of identity under Food and Drug Administration (FDA) regulations. Specifically, plaintiffs point out that the imported product is called "concentrated orange juice for manufacturing" and the retail products are known and labeled as "frozen concentrated orange juice" and "orange juice from concentrate." 21 C.F.R. §§ 146.145, 146.146, 146.153 (1985). This argument is not persuasive. First, Customs regulations and FDA regulations are promulgated under completely different statutes and hence one cannot be considered binding on the other. Second, the policies underlying the regulations are quite different and the interests of one would not be furthered by relying on the other. Specifically, the policy underlying the FDA standards of identity have been described by plaintiffs as chiefly designed to inform the consumer about ingredients in a product. Merrill & Collier, *"Like Mother Used to Make": An Analysis of FDA Food Standards of Identity*, 74 Colum.L.Rev. 561, 563 (1974). The policy underlying the country-of-origin marking statute, however, as noted in note 14, *supra*, is to facilitate consumer purchasing decisions and to protect American industry. The FDA standards of identity are intended to aid in identifying the contents of a product, not in identifying the origin of the product as a whole. The FDA standards are not binding on Customs in a determination of whether a substantial transformation has occurred.

cance of this producers' good-consumers' good transformation in marking cases is diminished in light of this court's recent decision in *Uniroyal, Inc. v. United States*, 3 CIT 220, 542 F.Supp. 1026 (1982), *aff'd*, 702 F.2d 1022 (Fed.Cir.1983). In *Uniroyal*, the imported article was a leather shoe upper to which an outsole was attached in the United States. Although the upper is not a consumers' good in that it cannot be worn as a shoe, the court found that there was no substantial transformation. *Id.* at 227, 542 F.Supp. at 1031. Under recent precedents, the transition from producers' to consumers' goods is not determinative. Plaintiffs must demonstrate that the processing done in the United States substantially increases the value of the product or transforms the import so that it is no longer the essence of the final product. *United States v. Murray*, 621 F.2d 1163, 1170 (1st Cir.1980) (Chinese glue blended with other glues in Holland were not substantially transformed because although it was transformed from a processors' good to an end-users' good there was no evidence that the glue had increased in value);[16] *Uniroyal*, 3 CIT at 224 and 222, 542 F.Supp. at 1030 and 1028 (imported upper was "the very essence of the completed shoe", court also found the attachment of uppers to outsoles "significantly less costly" than the process of manufacturing the upper).

Plaintiffs in the instant case offer evidence that they claim demonstrates that domestic manufacturing substantially increases the value of the product from the manufacturing concentrate stage to the re-

tail product stage. Contrary to plaintiffs' claim, however, the evidence offered indicates that the manufacturing concentrate constitutes the majority of the value of the end products. In fact, according to plaintiffs' evidence, the values added to the products involved here by the addition and blending of the orange essences, orange oil, and water, and related production range from 6.68 to 7.57%. This increase in value may be significant with regard to other products, but here the sum of all of the activities contributing to the added value are relatively minor, much like the addition of the outsoles in *Uniroyal*. In fact, plaintiffs' evidence shows that the addition of the oils and essences, the primary basis for plaintiffs' claim that substantial transformation has occurred, contributes only 1.75 to 1.86% to the value of the end products.[17]

Plaintiffs also contend that the value of the closing costs (for example, packaging) should be independently considered because of the alleged role of the closing activities in preserving the retail product. (The closing costs add 11.81 to 12.35% to the value of the final products.) Plaintiffs, however, cite no support for this proposition and the court does not find persuasive the argument that such costs are a factor in determining whether an article has undergone substantial transformation. *Cf. Ishimitsu v. United States*, 11 Ct.Cust. App. 186, T.D. 38,963 (1921).[18]

It is unclear whether plaintiffs contend that the addition of water constitutes a substantial change.[19] The court believes it

---

**16.** In *Murray*, the First Circuit, in interpreting 19 C.F.R. § 134.1(b), held that

the sub-term "substantial transformation" means a fundamental change in the form, appearance, nature, or character of an article which adds to the value of the article an amount or percentage which is significant in comparison with the value which the article had when exported from the country in which it was first manufactured, produced, or grown.

*Murray*, 621 F.2d at 1169.

**17.** It is not clear whether the addition of fresh orange juice is essential to the production of any of the retail orange juice products involved in this case. In any case, plaintiffs claim an

added value of approximately 1% for situations in which such juice is used. This minimal factor does not alter the result here.

**18.** Plaintiff does not appear to argue that mere blending of foreign with domestic concentrate is a substantial transformation. Thus, the value of the domestic concentrate is not considered in this analysis.

**19.** The court notes that in the Caribbean Basin Economic Recovery portion of the Caribbean Basin Initiative, Pub.L. 98–67, 96 Stat. 388 (1983), Congress has provided that a new and different article of commerce is not produced or manufactured in a beneficiary country by the

does not, in and of itself, constitute such a change in the context of the products under discussion. The court, however, did consider the value added by the addition of water together with the oils, essences and the overall blending process. Considering the process as a whole, the court concludes that Customs could rationally determine that the major part of the end product, when measured by cost, value, or quantity, is manufacturing concentrate and that the processing in the United States is a minor manufacturing process.

The court also finds reasonable Customs' conclusion that the manufacturing concentrate "imparts the essential character to the juice and makes it orange juice." C.S.D. 85–47, 19 Cust. Bull. No. 39 at 26. Thus, as in *Uniroyal,* the imported product is "the very essence" of the retail product. *Uniroyal,* 3 CIT at 224, 542 F.Supp. at 1030. The retail product in this case is essentially the juice concentrate derived in substantial part from foreign grown, harvested, and processed oranges. The addition of water, orange essences, and oils to the concentrate, while making it suitable for retail sale, does not change the fundamental character of the product, it is still essentially the product of the juice of oranges. The court concludes that Customs' ruling that manufacturing juice concentrate is not substantially transformed when it is processed into retail orange juice products is not arbitrary or capricious, but is in accordance with applicable law.[20] The orange juice processors are not the ultimate

purchasers of the imported product because consumers are the last purchasers to receive the product in essentially the form in which it is imported. In accordance with 19 U.S.C. § 1304, the retail packaging must bear an appropriate country-of-origin marking.

Having found that Customs' decision is not arbitrary and capricious and is thus substantively valid, the court must address the question of whether Customs was required to publish a notice in the Federal Register before publishing C.S.D. 85–47. Specifically, plaintiffs contend that such notice was required pursuant to Customs' regulation 19 C.F.R. § 177.10(c) (1985), which requires notice before publication of a ruling which has the effect of changing a practice or position of Customs.

The specific provision of this regulation that is the subject of dispute is section 177.10(c)(2).[21] As defendants have noted, section 177.10(c)(2) requires notice in the Federal Register if two conditions are met. First, the prospective ruling must have the effect of changing a Customs Service position. Second, the change must *result* in a restriction or prohibition.

The first question, then, is whether C.S.D. 85–47 constitutes a change of position. Defendant maintains that Customs had never taken an official position regarding the specific circumstances of this case, and that consequently they were relieved from the notice requirements. This argu-

"mere dilution with water or mere dilution with another substance that does not materially alter the characteristics of the article." 19 U.S.C. § 2703(a)(2)(B) (1982 & Supp.1983).

**20.** Plaintiffs also argue that Customs' ruling is arbitrary and capricious because in the ruling it stated that the certification requirements of the country of origin regulations will apply "[i]f the final repacked product of orange juice contains *any* foreign concentrate." C.S.D. 85–47, 19 Cust. Bull. No. 39 at 23 (emphasis added). Customs did not specifically refer to any blends besides those containing 30 and 50% foreign concentrate. In any case, the court considers the scope of the reviewable aspects of the ruling to be limited to retail orange juice products containing 30 or 50% foreign manufacturing concen-

trate. This decision does not address whether it would be appropriate to apply the country-of-origin marking statutes to products that contain any other percentages of imported manufacturing concentrate.

**21.** 19 C.F.R. § 177.10(c)(2) (1985) reads, in pertinent part, as follows:
 Before the publication of a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice that the position (or prior ruling on which the position is based) is under review will be published in the FEDERAL REGISTER and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change.

ment fails because an examination of Customs' prior rulings in orange juice related situations clearly establishes its position that orange juice manufacturing concentrate is substantially transformed if it is completely reconstituted or is blended with orange oils, essences or fresh juice.

On several occasions Customs has been called upon to determine whether orange juice at one stage of production is substantially transformed, *i.e.*, undergoes a change in name, character, or use, in the manufacturing process leading to another stage of production. These cases have arisen in the drawback context as well as in the country-of-origin context. The drawback rulings are instructive because the definitions of "substantially transformed" in the country-of-origin context and "manufacture" in the drawback context are similar.[22]

In these rulings Customs had adopted a position that for imported orange juice manufacturing concentrate to be considered "manufactured" or "substantially transformed," a substance other than water or other manufacturing concentrate must be added. This position can be seen by contrasting a ruling in which Customs held that blending imported manufacturing concentrate with domestic manufacturing concentrate does not constitute manufacturing for drawback purposes with a ruling that blending imported manufacturing concentrate with orange peel oil does. C.S.D. 81–81, 15 Cust.Bull. 900, 901 (Sept. 4, 1979) (Ruling 210693) ("[T]he mere blending or commingling of one concentrate with another concentrate of the same kind and quality does not constitute a manufacturing process for drawback."); C.S.D. 83–90, 17 Cust.Bull. 921, 922 (March 29, 1983) (Ruling 215734) ("The blending of cold-pressed orange peel oil with a batch of concentrated orange juice for manufacturing to mask the 'cardboard off flavor' of the concentrate is a manufacture or production for drawback."). The critical factor in distinguishing these rulings is the introduction of the orange peel oil, a differ-

ent substantive ingredient, into the concentrate. The significance of this distinction is demonstrated in dicta in the former ruling. After finding that the mere blending of concentrate does not constitute manufacturing, Customs offered two alternatives that would, in fact, satisfy the manufacturing requirement. First, Customs suggested that "[t]he addition by a blending process of essential oils and flavoring components to a concentrate that lacks them would be considered a manufacture or production for drawback." C.S.D. 81–81, 15 Cust.Bull. at 901. Second, Customs noted that "[t]he use of fresh juice to cut back the degree brix of concentrated orange juice for manufacturing is another manufacturing process for drawback." *Id.*

Furthermore, in a country-of-origin ruling, Customs found that concentrate at 58° or 65° brix that is subsequently diluted with water to 42.5° brix, but not completely reconstituted is not substantially transformed. C.S.D. 80–230, 14 Cust.Bull. 1138, 1138 (Feb. 21, 1980) (Ruling 712184). In a similar ruling, Customs found that reducing the degree brix of a concentrate by the addition of water is not a manufacturing for drawback. C.S.D. 80–162, 14 Cust.Bull. 1002, 1003 (Nov. 27, 1979) (Ruling 211084). In the latter ruling Customs again offered alternatives that would reduce the degree brix and would change the character and use of the manufacturing concentrate. These suggestions were the use of the following:

1. Fresh orange juice;

2. Pasteurized orange juice;

3. Essential oils and flavoring components;

4. Essential oils, flavoring components and water;

5. Essential oils, flavoring components and other orange concentrate; and

6. A combination of any of the above. *Id.* at 1004.

The most significant ruling involves the processing of frozen concentrate that is

---

**22.** See note 14, *supra,* for a comparison of the country-of-origin "substantial transformation" test with the drawback "manufacturing" test and a comparison of the different policies underlying the statutes.

reconstituted in Canada. C.S.D. 80–88, 14 Cust.Bull. 865 (Aug. 17, 1979) (Ruling 710823). Although the ruling does not specify the degree brix of the concentrate that is reconstituted, the opinion clearly applies to manufacturing concentrate that is made into reconstituted orange juice.[23] In other words, the process that is the subject of C.S.D. 80–88 is apparently the same process that is occurring in this case—manufacturing concentrate becomes reconstituted orange juice with the addition of water and presumably orange essences or oils. In C.S.D. 80–88, however, Customs found that this process substantially transformed the manufacturing concentrate into reconstituted juice. C.S.D. 80–88, 14 Cust. Bull. at 866.[24] In C.S.D. 85–47, at issue here, Customs decided that this process failed to substantially transform the product. The latter ruling directly contradicts the former, and Customs noted this in C.S.D. 85–47 when it stated at the end of the ruling: "Customs Ruling No. 710823 [C.S.D. 80–88], dated August 17, 1979, which holds that reconstitution of orange juice is a substantial transformation of the frozen concentrate, is overruled." C.S.D. 85–47, 19 Cust.Bull. No. 39 at 28.[25]

C.S.D. 85–47 constitutes a change in Customs' former position that the complete reconstitution of orange juice or the addition of orange oils, essences, or juice effects a substantial transformation of manufacturing concentrate. To this extent it satisfies the first requirement of section 177.10(c)(2), that is, a ruling that will effect a change in a position of Customs.

The second requirement for section 177.-10(c)(2) notice is that the ruling must *result* in a restriction or prohibition. Defendant argues that the ruling does not result in a

"restriction" or "prohibition" within the meaning of the regulation. In support of this position, it notes that section 1581(h) lists "marking" and "restricted merchandise" as separate categories over which this court has pre-importation jurisdiction. Defendant claims that because these categories are distinct in section 1581(h), the term "restriction or prohibition" in section 177.10(c)(2) cannot be construed to include a change in country-of-origin status. The separate listing in section 1581(h) of marking and restricted merchandise, however, is not determinative. The listing merely provides examples of the types of cases that might appropriately be brought for pre-importation review. (For example, total prohibition is not mentioned.) The list is more exemplary than definitional and the court cannot accept its categorization as definitive with regard to the inclusion of changes in marking requirements as resulting in a restriction under section 177.10(c)(2).

Furthermore, the reference in section 177.10(c)(2) to "restrictions and prohibitions" must be looked at in the context of section 177.10. Section 177.10 deals generally with the publication of decisions. 19 C.F.R. § 177.10 (1985). The provisions are presumably intended to keep the public and interested parties abreast of critical decisions made by Customs. Within this scheme, the regulations acknowledge that a change in a Customs Service position which results in a change in the amount of duty owed or in a restriction or prohibition may have a significant impact on the importing or other business practices of an industry. In such a case, it is important to warn the industry that changes may be necessary and to give interested parties an opportunity to respond. These policy con-

---

**23.** One of the end products at issue is reconstituted orange juice from concentrate.

**24.** If there is a difference between the processes at issue, the Canadian ruling, C.S.D. 80–88, is a worse case for substantial transformation than the one at hand, because oils and essences are undisputedly added here.

**25.** The court cannot agree with defendant's position that the fact that the processing involved in

C.S.D. 80–88 is that of Brazilian and American manufacturing concentrate in Canada and the processing involved in C.S.D. 85–47 is that of imported manufacturing concentrate in America makes any material difference. The basic question addressed in both rulings is whether, for marking purposes, manufacturing concentrate which is processed into retail orange juice products is substantially transformed.

siderations are fully applicable to a change in country-of-origin marking requirements. For instance, in this case, the retail orange juice processors will be required to change their labeling or drastically reduce their importation of manufacturing concentrate to avoid disruption from the imposition of the marking requirements. The transition to either of these practices cannot be instantaneous. Therefore, the imported manufacturing concentrate ruling will result in a restriction in the sense that products will not be released by Customs when the certification requirements cannot be met. Clearly the rationale underlying section 177.10(c)(2) provides a basis for concluding that the importers and other interested parties should be forewarned and given an opportunity to comment before Customs publishes a change in position that results in restricted importation of this product.

C.S.D. 85–47, then, is appropriately considered to be a ruling that changes a position of Customs and results in a restriction. Customs was in fact reviewing its position as to whether orange juice manufacturing concentrate is substantially transformed when completely reconstituted or blended with oils, essences, or juices. As a result, Customs was required to publish notice of these circumstances and to allow interested parties to submit written comments "with respect to the correctness of the contemplated change." 19 C.F.R. § 177.10(c)(2) (1985).[26]

Although defendant failed to publish the required notice of its change in position, this omission will only affect the ruling if it results in prejudice to the plaintiff. *Gilmore Steel Corp. v. United States*, 7 CIT —, 585 F.Supp. 670, 679 (1984); *American Motorists Insurance Co. v. United States*, 5 CIT 33, 43 (1983); *Timken Co. v. Regan*, 4 CIT 174, 180, 552 F.Supp. 47, 52 (1982); *Woodrum v. Donovan*, 4 CIT 46, 52, 544 F.Supp. 202, 207 (1982). In this case a harmless error determination must be made as to each of two parts of the ruling. The first part pertains to whether manufacturing concentrate undergoes a substantial transformation in being processed into frozen or reconstituted orange juice. Plaintiffs are not prejudiced by the failure to publish notice as to this issue because, as is obvious, plaintiffs fully participated in the administrative process. Furthermore, comments from the public at large cannot change the essentially legally correct result.

The second part of the ruling, however, involves the appropriate effective date of the ruling. Customs regulations relating to the type of ruling at issue here state

---

**26.** There is a dispute between the parties as to whether plaintiffs raised at the agency level the issue of publication of a change in position in the Federal Register and the possible effect this would have on plaintiffs' ability to raise the issue before the court. Under either scenario, however, plaintiffs' ability to raise the issue before the court has not been affected. If plaintiffs did suggest to defendant that notice of a change in position must be published in the Federal Register, then plaintiffs adequately exhausted their administrative remedies on this point. If plaintiffs did not make this suggestion, they still cannot be said to have waived the objection. Publication in the Federal Register is only required if Customs has decided to change its position. Although plaintiffs participated in discussions about whether a change in position was desirable, they did not know that Customs had decided to effect such a change before the new ruling was published in the Customs Bulletin. Once the ruling was published, there was no formal administrative procedure for challenging the failure to publish notice in the Fed-

eral Register. Prior to that time plaintiffs could not be certain that a ruling effecting a change in position would be published. *Cf. Lois Jeans & Jackets, U.S.A., Inc. v. United States*, 5 CIT 238, 243–44, 566 F.Supp. 1523, 1527–28 (1983) (plaintiff who received no notice (actual or constructive) of a change in ruling likely to succeed in raising § 177.10(c)(2) objection even though it learned of change before it was implemented). The fact that this notice provision involves a change in position affecting a wide variety of interests distinguishes this situation from the cases dealing with the effects of notice of an antidumping or countervailing duty investigation. *See, e.g., United States v. Elof Hannson, Inc.*, 296 F.2d 779, 48 CCPA 91 (1960), *cert. denied*, 368 U.S. 899, 82 S.Ct. 179, 7 L.Ed.2d 95 (1961) (antidumping); *Alberta Gas Chemicals, Inc. v. Blumenthal*, 82 Cust.Ct. 77, C.D. 4792 (1979) (antidumping) *Energetic Worsted Corp. v. United States*, 51 Cust.Ct. 55, C.D. 2413 (1963), *rev'd on different grounds*, 53 CCPA 36, C.A.D. 874 (1966) (countervailing duties).

that *"[e]xcept as otherwise provided for in the ruling itself,* all rulings published under the provision of this part shall be applied immediately." 19 C.F.R. § 177.10(e) (1985) (emphasis added). This caveat leaves to Customs' discretion the option to delay the effective date of a ruling.

In its initial ruling Customs chose an effective date of January 1, 1986, a four month lag time. C.S.D. 85–47, 19 Cust. Bull. No. 39 at 28. Customs offered no reasons for choosing this date. When Customs reconsidered and changed the effective date to March 1, 1986, it also failed to articulate the reasons underlying the change. 19 Cust.Bull. No. 50 at 15 (Dec. 11, 1985). Customs correctly recognized that this is a situation in which a lag time in the effective date is appropriate. Given the size of the industry and the limited services available to assist the industry in complying with the marking requirements, it would have been an abuse of discretion not to have delayed the effective date. From the record it is clear that Customs did not seek comments from all interested parties before reaching its decision. The problem with the original effective date chosen by Customs, as well as the subsequent amended effective date, is that there is nothing in the record or in the official statements by Customs that articulate what factors were considered in choosing the dates. " '[T]he failure of an administrative agency to articulate the reasons for a particular decision makes meaningful review of that decision impossible.' " *Public Media Center v. FCC,* 587 F.2d 1322, 1331–32 (D.C.Cir.1978) (quoting *American Smelting & Refining Co. v. FPC,* 494 F.2d 925, 945, *cert. denied,* 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) ).

Defendant argues that it would be contrary to the statute to delay the effective date of the ruling and that Customs has nonreviewable discretion in this area. First, this is clearly an area in which there are no policy reasons for ignoring the usual rule that presumes judicial review of agency decisions. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). Second, the marking statute is not written in absolute terms. There are statutory exceptions for commercial impracticability. *See,* 19 U.S.C. § 1304(a)(3) (1982). This case does not fall within any of the listed exceptions, but Customs has properly interpreted Congressional intent in promulgating 19 C.F.R. § 177.10(e), which allows a delay in the effective date of rulings, including rulings in this area. Surely Congress did not intend grievous commercial injury to occur as a result of too precipitous implementation of changes in rulings under the marking law.

The court concludes that Customs must reconsider the effective date for C.S.D. 85–47 and must articulate reasons for its choice. In so doing, Customs must adhere to the notice and comment provisions of section 177.10(c)(2) and carefully consider all possible issues relating to a reasonable time to implement its new ruling concerning country-of-origin marking requirements.

This case is remanded to Customs for further action in accordance with this decision.