**ARBOR FOODS, INC., Plaintiff,**

v.

**UNITED STATES, et al., Defendants.**

**Court No. 85–1–00102.**

United States Court of
International Trade.

March 13, 1985.

Graubard, Moskovitz & McCauley, Washington, D.C. (Alfred R. McCauley, Washington, D.C., on motion); Dykema, Gossett, Spencer, Goodnow & Trigg, Washington, D.C. (Norton Cutler, Washington, D.C., on motion), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, New York City (Michael P. Maxwell and Veronica A. Perry, New York City, on cross-motion) (Beth Brotman, Office of Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service, of counsel on cross-motion), for defendants.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

Plaintiff moves for summary judgment, or, in the alternative, a preliminary injunction. The defendants cross move for summary judgment, or, in the alternative, to dismiss for failure to state a claim.

Plaintiff has previously appeared before this Court seeking similar relief. In *Arbor Foods, Inc. v. United States*, 8 CIT ——, 600 F.Supp. 217 (1984) (*Arbor I*), the Court denied plaintiff's application for preliminary injunctive relief and dismissed the action. The Court declined to exercise its subject-matter jurisdiction under 28 U.S.C. § 1581(i) (1982), perceiving an "obviat[ion] [of] the usual procedure of administrative protest." *Arbor I*, 8 CIT at ——, 600 F.Supp. at 218. The plaintiff has now exhausted its administrative remedies before the United States Customs Service (Customs) and appears here via the traditional jurisdictional avenue, 28 U.S.C. § 1581(a). Oral argument on the motion was held on February 21, 1985.

The relevant facts have been stipulated by the parties and are not in issue. On June 28, 1983, the President issued Proclamation 5071 which placed a quota restriction on sirup and sugar blends classifiable under items 183.05, 183.01, 156.45, and 155.75 of the Tariff Schedules of the United States (TSUS) and containing over 65 percent sugar by dry weight. Subsequent to the issuance of the Proclamation, plaintiff began a screening operation at its Toledo, Ohio warehouse, which also qualified as a foreign trade zone.

Within the foreign trade zone, pure sugar from Canada was brought in and mixed with corn sirup solids of United States origin. The resulting mixture was then introduced into the Customs Territory of the United States. This introduction was accomplished by simply moving the mixture across a yellow line in the warehouse of plaintiff which marked the boundary between the zone and the Customs territory.

Once across the line, the mixture was screened to separate out the sugar component. The corn sirup solids were then brought back into the foreign trade zone for use with the next batch of Canadian sugar. Between July of 1983 and November of 1984, plaintiff imported 41,189 tons of dry mixtures containing 65 percent or less sugar and 24,950 tons of a sugar-corn sirup solids mixture.

On November 6, 1984, Customs transmitted telex 12003 which stated that only sugar blends possessing a "valid commercial identity and which are actually used in commerce in the United States" would be exempt from a constructive segregation. The effect of this notice was to place all sugar blends not meeting the standard within the ambit of the zero-quota provisions for pure sugar. Soon thereafter, all rulings issued to plaintiff prior to November 6, 1984, were revoked by Customs.

Customs then denied entry to 360 tons of the sugar/corn sirup solids blend as well as other blends. In addition, plaintiff allegedly was unable to stop twelve railcars of sugar in transit and was forced to resell at cost for a total loss of $67,100.

Plaintiff appeared before this Court pursuant to 28 U.S.C. § 1581(i) (1983) in December of 1984. The Court denied the requested relief and dismissed the case. Plaintiff then protested its denied entries. These protests were denied on January 4 and January 11, 1985.

## DISCUSSION

Plaintiff's arguments in support of its motion for summary judgment, or, in the alternative, for a preliminary injunction can be expressed as follows: (1) Customs' reliance on Headnote 7 of the General Headnotes and Rules of Interpretation of the Tariff Schedules of the United States (TSUS) is in excess of its authority; (2) the application of Headnote 7 is discriminatory in effect; (3) Customs has changed a "position" within the meaning of 19 C.F.R. § 177.10(c)(2) (1984), but has failed to comply with the mandatory prior notice and comment procedures outlined in the Customs Regulations; and, (4) if the Court finds that genuine issues of material fact exist, preliminary injunctive relief ought to be afforded in order to prevent further business injury. The government responds in kind to these arguments, and also raises an "imminent mootness" issue.

### I. GENERAL HEADNOTE 7, HEADNOTE 3 AND 19 U.S.C. § 1500

■ By telex of November 6, 1984, Customs' Office of Regulations and rulings advised that all "purported sucrose 'blends' will be considered commingled merchandise, pursuant to General Headnote 7, TSUS." The telex further stated that "[s]ucrose blends which possess a valid commercial identity and which are actually used in commerce in the United States ... shall be exempt from treatment as commingled merchandise." General Headnote 7, TSUS, referred to in the telex, provides in part:

> *Commingling of Articles.* (a) Whenever articles subject to different rates of duty are so packed together or mingled

that the quantity or value of each class of articles cannot be readily ascertained by customs officers (without physical segregation of the shipment or the contents of any entire package thereof)

. . . .

the commingled articles shall be subject to the highest rate of duty applicable to any part thereof unless the consignee or his agent segregates the articles pursuant to subdivision (b) hereof.

. . . .

(e) The provisions of this headnote shall apply only in cases where the schedules do not expressly provide a particular tariff treatment for commingled articles.

When the parties were before this Court in December of 1984, it appeared that Customs had relied solely on General Headnote 7 in promulgating the "valid commercial identity" standard. It is in this respect that plaintiff claims Customs exceeded its authority in issuing the telexes. Indeed, General Headnote 7 does not require nor even appear to authorize such a regulatory standard. But a statutory footing in Headnote 3 has been persuasively presented.

Prior to this controversy, plaintiff's mixture of sugar and corn sirup solids was classified under item 183.05, TSUS, which covers

Edible preparations not specially provided for (including prepared meals and individually packaged):

. . . .

Other:

. . . .

Other . . . . . . . . . . 10% ad val.

"Edible preparations," referenced in item 183.05, is defined in the subpart headnote: "The term *'edible preparations'* in [item] . . . 183.05 embraces only substances prepared and chiefly used as a human food or as an ingredient in such food. . . ." Headnote 3, Schedule 1, Part 15, Subpart B.

Defendants correctly note that a chief use provision is incorporated into item 183.05, by operation of Headnote 3. Headnote 10(e)(i), General Headnotes and Rules of Interpretation, TSUS (1984), further clarifies that chief use is "the use which exceeds all other uses (if any) combined." The chief use is measured, of course, at the time of importation. *United States v. Baltimore & Ohio R.R. Co.*, 47 C.C.P.A. 1, 3–4 (1959). Thus, although Customs is mandated to consider merchandise in its imported condition, *United States v. Citroen*, 223 U.S. 407, 414–15, 32 S.Ct. 259, 260, 56 L.Ed. 486 (1912), the doctrine of chief use requires that the items be followed into the commerce of the United States. As such, Customs has every right to demand evidence of the possible uses of the product. *See Advance Solvents & Chemical Corp. v. United States*, 34 C.C.P.A. 148, 154 (1947). This can be established, among other means, through affidavits from ultimate purchasers or importers' testimony; further, per the telex, a demonstration of actual use was all that was necessary. But Arbor claims that knowledge of chief use is beyond its ken. This will not do. Importers "have every incentive for knowing the uses to which their wares are or may be put." *Klipstein v. United States*, 1 Ct. Cust.Appls. 122, 124 (1910); *see Manton Cork Co. v. United States*, 65 Cust.Ct. 241, 249 (1970) (Re, J.).[1] Drawing upon these principles, the Customs Service simply invoked its authority under 19 U.S.C. § 1500 (1982), to change a classification. The after-entry screening process, which plaintiff claims was Customs' target, was not relevant. Customs' new knowledge that plaintiff's entries were not truly "edible preparations" triggered the change. Thus, despite plaintiff's vehement protestations that a classification matter is not involved here but rather "a test of the legality of the end Defendants realized—the exclusion from entry of Plaintiff's merchandise,"

---

1. Defendant, in its reply, has pointed out that Customs recently allowed Arbor to make nine entries of its sugar/corn sirup solids mixture upon proper documentation of valid commer- cial identity. As indicated earlier, while the Court does not endorse this standard, it is clear that evidence of "commercial identity" is highly pertinent to "chief use."

Plaintiff's Memorandum in Opposition at 1–2, the Court views the matter as a change in classification which resulted in quota provisions becoming applicable. This is not uncommon. *See Wear Me Apparel Corp. v. United States*, 1 CIT 60, 61 (1980).[2]

In short, Customs was within its authority under 19 U.S.C. § 1500 (1982), in demanding proof of valid commercial identity as one means of establishing chief use before allowing entry of plaintiff's mixtures. Customs rightfully considered such a showing highly pertinent to the issue of chief use as an edible preparation.

## II. HAS CUSTOMS "CHANGED A POSITION" UNDER 19 C.F.R. § 177.10(c)(2)?

■ Section 177.10(c)(2) of the Customs Regulations provides in part:

> Before the publication of a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice that the position (or prior ruling on which the position is based) is under review will be published in the Federal Register and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change.

As is evident from the regulation, if Customs has established a "position" with respect to a particular classification matter, and that position is sought to be changed with the effect of prohibiting or restricting merchandise, then a notice that the change is being contemplated must be published in the *Federal Register.* Plaintiff claims that a series of ruling letters, oral assurances from various Customs officials, and re-

missions of liquidated damages claims resulted in the establishment of a "position" with regard to plaintiff's merchandise. Therefore, according to plaintiff, Customs was obliged to publish a notice and afford opportunity for comment before the "position" could be changed.

■ For several reasons, however, plaintiff's contentions must fall. First, the exact merchandise in issue here was never specifically covered by a letter ruling. Thus, Customs could not have staked out a position with respect to the mixture. Also, even if the Court were to consider plaintiff's assertions, they would not amount to a "position" on behalf of the Customs Service pursuant to 19 C.F.R. § 177.10(c)(2). Customs' establishment of a "position" would be along the same lines as that of an "established and uniform practice" under 19 U.S.C. § 1315(d) (1982). In that respect, such a "position" or "practice" would require uniform liquidations among the many ports over a period of time. *See Heraeus-Amersil, Inc. v. United States*, 8 CIT ——, 600 F.Supp. 221, 225 (1984). The acts by Customs which plaintiff claims amounted to a "position" fall short of that rigorous standard. Further, Customs never expressly found a position to exist.

The Court would also note that on December 14, 1984, the Secretary of the Treasury, through the Office of Regulations and Rulings at Customs Headquarters, issued a finding that an established and uniform practice did not exist with respect to blends of 50 percent sugar and 50 percent sirup solids. As the Court noted in *Heraeus-Amersil*, once the Secretary exercises his discretion, his decision is normally beyond review. *See Heraeus-Amersil*, 8 CIT at ——, 600 F.Supp. at 224.

---

**2.** Plaintiff also claims that Customs has treated it in a discriminatory fashion. First, plaintiff asserts that if a mixture contains more than 65 percent sugar, Customs does not require proof of commercial identity before placing the merchandise in item 183.05. Second, plaintiff maintains that Customs does not apply Headnote 7 to mixtures that have a valid commercial identity but are later screened. The Court finds

these arguments completely unpersuasive. If merchandise contains more than 65 percent sugar, there is no dispute—classification or otherwise. Such goods are clearly prohibited from entry. Customs need not carry out useless formulations in such a case. Also, where a mixture is shown to have a valid commercial identity and is therefore permitted entry, chief use as an edible preparation is assuredly present.

Plaintiff's argument that a position existed under 19 C.F.R. § 177.10(c)(2) must, accordingly, fail.

### III. IMMINENT MOOTNESS

■ On January 28, 1985, President Reagan issued Proclamation 5294, which imposed additional quota restraints on sugar products. The Proclamation covers "articles containing sugars ... whether or not mixed with other ingredients." Both parties admit that plaintiff's imported merchandise is subject to Proclamation 5294. The parties have estimated that the quota will close on approximately March 15, 1985.

Defendants therefore argue that the Proclamation "will soon moot out this controversy." Defendant's Opposition, at 17. The Court has little difficulty in finding that this controversy is not moot.

The judicial power of the United States extends to cases or controversies. U.S. Const. art. III, § 2, cl. 1. Until the quota closes, this Court could render effective relief to plaintiff by granting its proposed remedy. Indeed, the Supreme Court has rejected the "impending mootness" argument. *See Washington v. Washington State 'Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979). The Court, therefore, sees fit to rule in the case despite the imminence of the quota.[3]

### CONCLUSION

Through the uncontroverted facts in this case, no genuine issues of material fact are apparent to the Court. Accordingly, summary judgment is appropriate. Summary judgment in favor of the defendants is in order.

A judgment will enter accordingly.

---

**3.** Regarding preliminary injunctive relief, the Court in Arbor I indicated that it found the injury alleged by plaintiff to be speculative and insufficient to warrant the extraordinary remedy of a preliminary injunction. *See Arbor I,* 8 CIT ——, 600 F.Supp. at 220 (citing *Manufacture de Machines du Haut-Rhin v. Von Raab,* 6 CIT ——, 569 F.Supp. 877, 881, *appeal dismissed,* No.

83–1341 (Fed.Cir. Dec. 29, 1983)). The nature of the injury, damage to goodwill and other similar allegations, which the Court previously found unsatisfactory, remains so. In addition, as discussed above, plaintiff has not succeeded on the merits. Accordingly, a preliminary injunction cannot issue.