**SUPERIOR WIRE, a Division of SUPERIOR PRODUCTS COMPANY, a Michigan Corporation, Plaintiff,**

v.

**The UNITED STATES, et al., Defendants.**

**Court No. 87–06–00750.**

United States Court of International Trade.

Aug. 21, 1987.

---

Richard A. Kulics, Birmingham, Mich., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Inter. Trade Field Office, Civil Div., U.S. Dept. of Justice, John J. Mahon, New York City, for defendants.

## OPINION

RESTANI, Judge:

■ Plaintiff, an importer of steel wire from Canada, challenges the denial of its protest against the exclusion of a shipment of wire made from wire rod produced in Spain.[1] The United States Customs Service (Customs) excluded the wire because it was not accompanied by certificates that would allow its entry under a voluntary restraint agreement (VRA) with Spain covering wire and wire rod.[2]

In connection with this action plaintiff sought a temporary restraining order and a preliminary injunction to allow it to continue importing. A temporary restraining or-

---

1. Despite the caption of the case, plaintiff is the corporate entity, Superior Products Company.

2. Jurisdiction to determine the protestable issue is present under 28 U.S.C. § 1581(a) (1982). Plaintiff also alleges jurisdiction under § 1581(i)(3)(4) (1982). In *Ferrostaal Metals Corp. v. United States,* 11 CIT ——, 664 F.Supp. 535 (1987) the court found that in that case it was not proper to assume jurisdiction under § 1581(i) when jurisdiction under § 1581(a) was present to review a decision as to whether certificates were required by a VRA. Theoretically, it may be possible to assume jurisdiction under § 1581(a) as to protested entries and under § 1581(i) as to future entries. Jurisdiction under § 1581(i), however, is generally assumed in unusual situations, "such as when the relief available in an action brought under section 1581(a) would be manifestly inadequate or when necessary because of special circumstanc-

es to avoid extraordinary and unjustified delays caused by the exhaustion of administrative remedies." *Ferrostaal,* 664 F.Supp. at 537. Citing *Lowa, Ltd. v. United States,* 5 CIT 81, 561 F.Supp. 441 (1983), *aff'd,* 724 F.2d 121 (Fed.Cir. 1984). Thus, in cases where a party is able to pursue administrative remedies, such as those involving the denial of a protest challenging a substantial transformation decision, jurisdiction under § 1581(a) generally will be adequate. In addition to depriving Customs of the right and duty to consider the proper disposition of future entries, attempts to fashion declaratory and injunctive relief as to future entries present numerous problems. One cannot be sure that the future imports will be identical. Furthermore, the question arises as to what should be the scope or duration of the relief. Thus, except where equity demands it, relief should be limited to protested entries.

der was granted. The order was extended to the date of the preliminary injunction hearing conditioned upon the posting of bond. Following hearing on the preliminary injunction and the merits on July 27, 1987, defendant declined to consent to the continuation of any temporary relief. The court, finding that further posting of bond was not in the interest of either party, and finding no immediate irreparable harm, declined to continue the temporary restraining order. Further trial on the merits and on the motion for preliminary injunctive relief was held on August 11, 1987. The court denied preliminary relief.

## FACTS

Plaintiff has been importing wire made from Spanish hot-rolled wire rod since late 1984. It obtains the finished cold-drawn wire from its related company, Big Point Steel Company, in Ontario, Canada. It is the operations of Big Point which are the main focus here.

The evidence discloses that plaintiff orders the wire rod from Spain for delivery to Canada. The rod arrives in coils of about 2,700 pounds each. The rod is uncoiled, and cleaned during passage through a mechanical descaling machine, which removes a hard oxide crust by reverse bending. The scale is formed during the rod-making process and must be removed to prevent damage to the wire-drawing equipment. The rod is then coated with a spray-on lubricant/rust preventative. The coils are joined by butt-welding, to facilitate feeding the dies, and because the end product is a 2,000 pound coil. Generally, the butt-welding process may also involve annealing across the joint so that the composition of the wire will be the same throughout. There was no testimony as to whether annealing took place at Big Point.

The operation crucial to resolution of this matter is the process which turns the wire rod into wire. In order to feed the machine which contains the dies that cold draw the rod into wire, the rod must be pointed and inserted into the machine. The rod is drawn through one, two and possibly, in a few cases, three dies. The testimony was contradictory as to whether one or two die passes were most commonly needed for the sizes of wire drawn by plaintiff, but plaintiff's witnesses seemed to have more familiarity with the process and the court accepts their testimony that two die passes are normally involved. Testimony also indicated that this process increases the tensile strength by thirty to forty percent as the rod is reduced in cross-sectional area by about thirty percent and is elongated. Other evidence indicated this degree of strength increase may be slightly high, but it is not greatly overstated. The final result is a substantially stronger product, which is also cleaner, smoother, "less springy," less ductile, and cross-sectionally more uniform.

Seventy percent of the wire imported by plaintiff is intended for use in making wire mesh for concrete sewer pipe reinforcement, which requires the strength of the finished wire. Twenty percent of the wire imported by plaintiff is sold as wire. The wire has about one dozen applications, such as shelving or decking and baskets used in the automotive industry. Wire rod has few uses except for making wire. Only a very small percentage of rod is used directly in concrete reinforcement.

The wire rod is of low carbon content. It is referred to as industrial quality or mesh quality rod. The rod is purchased by plaintiff for its affiliate from the Spanish producer in six sizes which range from $7/32$ of an inch to $7/16$ of an inch. The sizes of rod imported produce a range of sizes of wire, but the physical properties of the rod limit the range of sizes of wire which may be effectively or economically produced from a particular size of rod. It is also the chemical content of the rod and the cooling processes used in its manufacture which determine the properties that the wire will have after drawing.

Production of finished cold drawn wire from raw materials, such as scrap metal, involves several processes. The first step is to produce a steel billet. The particular process described at trial was that utilized

by a domestic wire rod producer.[3] There was no testimony indicating that the process used to produce the wire rod at issue was significantly different. The billet is a piece of steel about fifty feet long and five and one-eighth inches on each side, if measured cross-sectionally. Depending on the desired composition of the rod to be produced, a selection of different types of scrap are chosen. The scrap is melted in an electric furnace at 2700° Fahrenheit. The molten metal is refined by adding lime, oxygen, and possibly other additives to remove impurities. After the impurities are removed the steel is poured into a ladle and then into a tundish (a brick lined, steel container with holes). The steel then flows into a caster and the billets are formed. The testimony indicated that the scrap costs about one hundred dollars per ton, and at an efficient plant the making of a billet costs about the same.

The next step is the production of wire rod from billets. The billet is reheated to 2100° F. The rod mill described involves twenty-five separate rolling stages (stands) and two lines of billets can be processed at once. The first seven stands are called the roughing stage. The hot billets are passed through horizontal stands which gradually remove the corners of the billets to achieve a more cylindrical shape. The next four stands are also horizontal and are called the intermediate stage. The third stage also involves four stands but they are alternately horizontal and vertical. Finally, ten carbide rolls size down the rod into its final form. The process is computerized and moves at high speed so that water cooling is required to keep friction from raising the temperature above 2100°. The rod coils produced are then laid out with certain spacing depending on the rate of cooling needed. Air blowers can increase the cooling, and the use of hoods can decrease it.

The testimony indicated that the rolling mill cost between sixty and one hundred million dollars and a new mill would cost perhaps four times that amount. The testimony also indicated that much smaller operations are not economically feasible. The domestic producer's rolling operation involves one hundred and twenty-five employees and another sixty employees for quality control. The cost of producing one ton of rod from billet was placed at between forty and eighty dollars, depending on efficiency.

Testimony at trial indicates that a cold-drawing facility can be established for less than two hundred fifty thousand dollars. Plaintiff's operation seems within that range. A used drawing machine may be purchased for as little as thirty-five thousand dollars. Testimony indicated that three employees are needed to run a cold-drawing machine. Plaintiff operates its Canadian plant around the clock five days per week. Plaintiff's accountant stated that recent figures indicated that the cost of cold-drawing the wire from wire rod was about thirty-six dollars per ton. This figure has not been challenged seriously by defendant, and there was some evidence indicating that the figure is slightly understated if viewed in relation to a more general assessment of cost. In early 1987, the price of wire from Big Point to its affiliate was about two hundred eighty dollars per ton. Plaintiff paid two hundred thirty-five dollars per ton for the Spanish rod during the same period.

There seems to be agreement between the parties that the value added in terms of cost of the drawing process is about fifteen percent. During the relevant period domestic wire rod could be purchased for about three hundred dollars per ton. Also during this period, plaintiff sold wire at a substantially higher price to independent customers than it did internally.

Wire rod cannot be hot-rolled to a sufficiently round state to meet specifications of wire. To those in the steel and wire industries, wire rod and wire are different products. They are also classified differently for tariff purposes.

## ARGUMENTS

Plaintiff raises two arguments. It asserts that the wire rod was substantially

**3.** The domestic rod producer filed an *amicus* brief which the court accepted.

transformed in Canada into wire so that the product it seeks to import is a product of Canada, not Spain, and therefore is not covered by a VRA. Plaintiff also asserts that Customs' action regarding the shipment at issue represented a change in position resulting in a restriction, which change may not take place without notice and opportunity for comment, pursuant to 19 C.F.R. § 177.10(c)(2) (1986).

Defendant argues that the operations performed in Canada were minor and that the court should consider the purpose of the VRA and find that the wire is a product of Spain not Canada. Defendant also argues that Customs did not take a "position" within the meaning of § 177.10(c)(2), and thus no opportunity for comment is required.

### EXISTENCE OF A "POSITION"

■ Two opinions of this court have treated directly the issue of the existence of a position for purposes of § 177.10(c)(2). *National Juice Products Ass'n v. United States*, 10 CIT —, 628 F.Supp. 978 (1986); *Arbor Foods, Inc. v. United States*, 9 CIT 119, 607 F.Supp. 1474 (1985). In *National Juice* the court found a "position" to exist, based on the existence of several rulings published in the Customs Bulletin that provided a factually explicit description of a Customs position of at least eight years standing. *Arbor Foods* reached the opposite result, finding that "a series of ruling letters, oral assurances from various Customs officials, and remissions of liquidated damages claims" did not constitute a position, where the exact merchandise was not covered by a ruling letter. 607 F.Supp. at 1478.[4]

The court finds the situation at hand more akin to that described in *Arbor Foods* than to that described in *National Juice*. Here there was one ruling letter, vaguely describing a wire-making process in Mexico and finding substantial transformation for purposes of the law relating to the General-

ized System of Preferences (GSP). No. 553052 CW (Aug. 20, 1984). This letter ruling was only available to the public via microfiche, an indication that Customs did not consider the ruling letter to be of widespread applicability. Rulings of broad precedential value are generally published in the Customs Bulletin, as were those in *National Juice*. The letter ruling at issue is a "precedential" decision, which must be made otherwise "available for public inspection." 19 C.F.R. § 177.10(a). It need not be published in the Customs Bulletin.

Publication in the Customs Bulletin has dramatic effects in some areas. For example, rates of duty may not be raised beyond the rates published in the Customs Bulletin, without notice and opportunity for comment. 19 C.F.R. § 177.10(b) & (c)(1). Although 19 C.F.R. § 177.10(c)(2), regarding restrictions of imports, does not refer directly to publication of rulings in the Customs Bulletin, the court in *National Juice* found such publication important to its analysis of whether Customs had established a "position" that could not be revoked without notice under the terms of § 177.10(c). 628 F.Supp. at 994.

Plaintiff had the option of obtaining its own letter ruling, which would have given it the right to notice before a change. 19 C.F.R. § 177.9(c). Plaintiff did not avail itself of this mechanism but chose to rely on a cryptic letter directed to another. In sum, the letter ruling at issue was neither sufficiently descriptive to be broadly applied, nor was it clearly adopted as the position of Customs regarding merchandise of the type sought to be imported by plaintiff under the circumstances in which plaintiff sought to import it.

Plaintiff also cites the fact that the local Customs officials acquiesced in similar importations for more than two years, relying in part on the letter ruling. Such actions did not establish a "position" in *Arbor Foods*, and they do not suffice here. As no

---

**4.** In *Arbor Foods,* the court went on to state that "Customs' establishment of a 'position' would be along the same lines as that of an 'established and uniform practice' under 19 U.S.C. § 1315(d) (1982)." 607 F.Supp. at 1478. The court does

not read this to mean that a "position" is the same as an "established and uniform practice." Customs certainly could have used this term of art if that is what it meant by its regulation.

"position" had been established for purposes of § 177.10(c)(2), defendant is free to exclude plaintiff's merchandise immediately, if the substantive law permits.

### SUBSTANTIAL TRANSFORMATION

The basic issue before the court is whether the wire sought to be imported is a product of Spain or of Canada for purposes of enforcing the VRA. The parties agree that the court should make its determination on the basis of whether the wire rod imported from Spain is substantially transformed in Canada. This was the standard recently applied to such questions in *Ferrostaal Metals Corp. v. United States*, 11 CIT ——, 664 F.Supp. 535, Slip Op. 87–76 (June 26, 1987), in which the court found that Japanese export certificates need not be provided for cold-rolled steel sheet which was subjected to a hot-dip galvanizing process in New Zealand.

There is, however, a preliminary dispute as to whether the court may consider the purpose of the VRA in making its decision as to whether a substantial transformation occurred. In *National Juice*, 628 F.Supp. at 988–89 n. 14, the court indicated that as the concept of substantial transformation arises in several contexts under the customs laws, differing statutory language or purposes might vary the results in cases involving the issue of substantial transformation. At issue in that case was the country of origin of orange juice products for marking purposes. The court found cases discussing substantial transformation in the context of marking most directly applicable, although the court relied on cases applying similar standards in other areas. Similarly, in *Torrington Co. v. United States*, 764 F.2d 1563, 1571 (Fed. Cir.1985), the court indicated it was "keeping in mind the GSP's fundamental purpose of fostering industrialization in [beneficiary developing countries]...." in making a substantial transformation decision regarding the production of needles.

In this case there is no statutory language or legislative purpose which will directly guide the court. The Executive branch may negotiate voluntary restraint agreements. 19 U.S.C. §§ 2111–2213 (1982 & Supp. III 1985). The President may also enforce such agreements relating to steel products by requiring export licenses. Steel Import Stabilization Act, § 805, 19 U.S.C. § 2253 note (Supp. III 1985). Although § 803 of the Steel Import Stabilization Act indicates a Congressional desire that a specific market share be obtained by United States industry, a bilateral agreement involves more than the ultimate goals of the United States. The agreement, being the product of negotiation, contains terms balancing various interests. The court has no way of attributing an overriding purpose to the VRA at issue in a manner that can guide the court's decision here. The VRA has no terms which define the standards applicable to a determination of whether the product imported is the product of the signatory country so as to trigger the requirement of a certificate. Thus, to the extent it is possible, the court must seek a neutral standard, unaffected by specialized statutory purpose, to determine the country of origin of the merchandise at issue. *Cf. Ferrostaal*, 664 F.Supp. at 539 ("multiple standards in these cases would confuse importers and provide grounds for distinguishing useful precedents"); *Cardinal Glove Co. v. United States*, 4 CIT 41, 44 (1982) [Available on WESTLAW, DCT database] (language of bilateral textile agreement must be given construction consistent with language in tariff laws).

The court now turns to the fundamental question of whether under generally applicable precedent a substantial transformation of the wire rod from Spain occurs when it becomes wire, so as to make the wire a product of Canada, and thus not subject to VRA restrictions. The basic test cited by the parties was set forth in a drawback case, *Anheuser-Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336 (1908), which held that a product would be considered the manufacture or product of the United States if it was transformed into a new and different article "having a distinctive name, character or use." The test has been applied in various situations. Cases giving

rise to the most generally cited precedent are those involving country of origin for marking purposes, application of the GSP, and drawback. In addition, the parties have cited two import restriction cases which apply the same basic test. *See Ferrostaal,* 664 F.Supp. at 537; *Cardinal Glove,* 4 CIT at 45.[5]

Although all recent cases cite the *Anheuser-Busch* test, they apply it differently, and modify it somewhat. A name change, for example, is not always considered determinative. *United States v. Int'l Paint Co.,* 35 CCPA 87, 93–94, C.A.D. 376 (1948). Therefore, although it is clear that a name change from "wire rod" to "wire" occurred here, this fact is not necessarily determinative. It may support, however, a finding of substantial transformation, as it did in *Ferrostaal.* Likewise the change in tariff classification which occurred here (*see United States v. Kanthal Corp.,* 64 CCPA 89, 91, 554 F.2d 456, 457 (1977)) is not dispositive, although it also may be supportive. *Belcrest Linens v. United States,* 741 F.2d 1368, 1372–73 (1984).

In recent years the courts have concentrated on change in use or character, finding various subsidiary tests appropriate depending on the situation at hand. An inquiry that is sometimes treated as a type of cross-check or additional factor to be considered in substantial transformation cases is whether significant value is added or costs are incurred by the process at issue. *See United States v. Murray,* 621 F.2d 1163 (1st Cir.) (blending of glues added no significant value), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980). In *National Juice,* values of between one and eight percent were not found to be significant. 628 F.Supp. at 990. In *Uniroyal v. United States,* 3 CIT 220, 223–24, 542

F.Supp. 1026, 1029 (1982) *aff'd,* 702 F.2d 1022 (Fed.Cir.1983) (addition of outer sole did not substantially transform shoe upper under marking laws), no percentage was specified, but the cost of the alleged transformation was deemed insignificant. 542 F.Supp. at 1029–30. In *Ferrostaal,* on the other hand, a value, attributable to the transformation of at least thirty-six to nearly fifty percent of the value of the heat treated steel, reinforced the court's conclusion that galvanizing and annealing steel constituted a substantial transformation. 664 F.Supp. at 540.

A value added test has appeal in many situations because it brings a common sense approach to a fundamental test that may not be easily applied to some products. The fifteen percent added value figure for the wire standing alone does not pull in either direction, but related concepts, including the amount of labor required to accomplish the change and the capital investment required relative to that required to produce the entire article, are also relevant to a determination of whether the change involves minor processing. Minimal processing is part of the factual background of cases such as *Murray, National Juice* and *Uniroyal,* all of which involve findings of no substantial transformation. The differences in capital investment and labor needed in the production of wire rod versus wire are enormous. Comparing only the production of wire from wire rod, versus the production of wire rod from billet, it becomes apparent that the processing performed in Canada is a minor finishing step which may be accomplished easily anywhere with a minimal amount of effort and investment.[6] By itself such analysis may not provide the entire answer as to whether a substantial transformation has taken place, but it should comprise part of

---

**5.** Although *Cardinal Glove* purported to apply the "country of exportation" test to the merchandise at issue, it appears that the court's analysis also encompassed the factors outlined in *Anheuser-Busch.* The court's use of the term "country of exportation" in *Cardinal Glove* has been a source of controversy. *See* T.D. 82–169, 16 Cust.B. & Dec. 471 (1982); T.D. 84–171, 18 Cust.B. & Dec. 480 (1984). In the case at bar,

the parties agree that the test set forth in *Anheuser-Busch* provides the proper legal standards.

**6.** The court excludes from this comparison the requirements of producing billet from raw material. Because the wire rod is clearly a different product, which involves a substantial transformation from billet, the better approach would seem to be disregard of the earlier stage.

the analysis in a case involving the type of products and processes at issue here.

Turning to past precedent, the court observes that cases dealing with substantial transformations are very product specific and are often distinguishable on that basis, rather than by their statutory underpinnings. It is difficult to generalize from cases involving combinations of articles to those that involve processing of a single material. In addition, it is frequently difficult to take concepts applicable to products such as textiles and apply them to combinations of liquids or fabrication of steel articles. To determine whether the goods at hand are substantially transformed for purposes of VRA enforcement, the court should examine cases involving processing of metal objects without combination or assembly operations. *Torrington Co. v. United States*, 764 F.2d 1563 (1985) is one such case. As indicated, it involved the manufacture of needles in a beneficiary developing country. In the first stage of production of needles, a wire is straightened, cut, beveled, and drawn to form a needle blank. The blank is only useful in the needle-making process. In the next stage, an eye is struck into the needle, a groove is made for thread, and the needle is finished by various processes, including hardening, sharpening, and polishing. The *Torrington* court found that in order for plaintiff to prevail under the GSP statute, two substantial transformations were necessary; the court found both the first and second stages to be substantial transformations.

The second stage of processing discussed in the *Torrington* case involved a transformation from producers' to consumers' goods. The *Torrington* court cited with approval the case of *Midwood Indus. v. United States*, 64 Cust.Ct. 499, 313 F.Supp. 951 (1970), in which rough forgings of the approximate dimensions of the finished products were found to be substantially transformed after being cut, tapered or trimmed, beveled, bored, and subjected to other finishing processes in order to create pipe flanges and fittings. The producer to consumer goods distinction drawn in *Midwood*, a marking case, however, was found

not determinative as to substantial transformation in shoe construction in another marking case, *Uniroyal.* Although some of the processes involved here are the same as those involved in the second phase of *Torrington*, there is no clear change from producers' to consumers' goods. Wire rod is primarily intended for wire production, which, in turn, is primarily intended to be used for making wire mesh for concrete pipe reinforcement.

The processes involved in the first stage of *Torrington* are closer to the ones involved here. In fact, the *Torrington* court cited in support of its holding a Treasury Decision involving use of dies to draw plate steel into a cup-shaped rear engine housing. *See Torrington*, 764 F.2d at 1569 (discussing T.D. 78–400, 12 Cust.B. & Dec. 875 (1978)). Two factors distinguish this aspect of *Torrington* from the case at hand. First, once the needle blanks were drawn they were fit for only one purpose; the raw material was then destined for one end use. This type of transformation does not occur when wire rod is drawn into wire. The composition of the wire rod determines what uses the wire may have. Although the steel and wire industries may have different names for the products, wire rod and wire may be viewed as different stages of the same product. The difference in stages may be important for tariff purposes but it is not determinative here. In contrast, the *Torrington* court stated, "the initial wire is a raw material and possesses nothing in its character which indicates either the swages [blanks] or the final product." *Torrington* at 1568. Here, the wire rod dictates the final form of the finished wire. Second, the court cannot escape the statutory basis of the *Torrington* opinion. Apart from direct references to the purpose of the GSP already mentioned, the court also noted, "... Torrington Portuguesa could do no more than it already does in the production of needles. In these circumstances we think Congress intended the GSP statute to apply." *Id.* at 1571.

The engine housing decision cited by *Torrington* also differs from the case at hand. Like the wire to needle blank change, the

product was transformed from basic steel into a part with a unique destiny. In addition, the decision noted the involvement of a series of dies. Essentially only two die passes are involved here. The wire emerges stronger and rounder after the passes, but the wire loses a few other advantages, such as greater ductility, in the process. It looks much the same. Its strength characteristic, which is important to its end use, is altered, but the parameters of the strength increase was metallurgically predetermined in the creation of the steel billet and very specifically through the fabrication of the wire rod. Under these circumstances the court does not find a significant change in use or character to have occurred.

The court should also mention here the *Ferrostaal* case. The hot-dipped galvanizing processes involved there, which involved substantial chemical changes, were different from the cold drawing processes involved here. Although, applying broader analytical concepts, the changes in use and character were not greatly different from those involved here, the value added was significant. It appears that a larger capital investment, as well as possibly significant labor, was required to accomplish the transformation in *Ferrostaal*. Taken together these differences are sufficient to distinguish *Ferrostaal* from the case at hand.

Here only the change in name test is clearly met, and such a change has rarely been dispositive. No transformation from producers' to consumers' goods took place; no change from a product suitable for many uses to one with more limited uses took place; no complicated or expensive processing occurred, and only relatively small value was added. Overall, the court views the transformation from wire rod to wire to be minor rather than substantial. Accordingly, the country of origin of the wire must be considered Spain rather than Canada.

Judgment is entered for defendant.