**SUPERIOR WIRE, Plaintiff–Appellant,**

v.

**The UNITED STATES, William Von Raab, Commissioner of Customs, and District Director of Customs at port of Detroit, Michigan, Defendants–Appellees.**

No. 88–1020.

United States Court of Appeals,
Federal Circuit.

Feb. 15, 1989.

Richard A. Kulics, Birmingham, Mich., argued, for plaintiff-appellant.

John J. Mahon, Commercial Litigation Branch, Dept. of Justice, New York City, argued, for defendants-appellees. With him on the brief, were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office.

Charles Owen Verrill, Jr., Wiley, Rein & Fielding, Washington, D.C., argued, for

amicus curiae Raritan River Steel. With him on the brief, was Lynn S. West.

Before NIES, BISSELL and ARCHER, Circuit Judges.

ARCHER, Circuit Judge.

Superior Wire (Superior) appeals the judgment of the United States Court of International Trade, 669 F.Supp. 472 (Ct. Int'l Trade 1987), that wire drawn in Canada from Spanish wire rod is not "substantially transformed" for purposes of determining the country of origin under a Voluntary Restraint Agreement between the United States and Spain. We affirm.

## I

Superior began importing wire rod from Spain into Canada in 1984 following the imposition of preliminary anti-dumping and countervailing duties on wire rod imported from Spain into the United States. In a newly-established wire drawing facility in Canada, Superior drew the wire rod into wire before shipping the wire to its wire mesh operation in Michigan. It claimed Canada as the country of origin instead of Spain.

Superior's practice continued when, pursuant to the Steel Import Stabilization Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948 (1984), *reprinted in* 19 U.S.C. § 2253 note (1982 & Supp. IV 1986), the United States entered into a Voluntary Restraint Agreement (VRA) with Spain covering wire and wire rod. While these products were no longer subject to duties, they were limited by quotas and could not enter the United States without validated export licenses. In March 1987, the Customs Service issued Ruling 075923 JLV, which determined that the drawing of wire from wire rod does not constitute a substantial transformation. Based on this ruling, Superior's imports of drawn wire from Canada were classified as being of Spanish origin.

The Court of International Trade held that Ruling 075923 JLV did not represent a change of "position" on the part of the Customs Service that necessitated publication in the Federal Register and opportunity for public comment. *See* 19 C.F.R. § 177.10(c)(2) (1988). This issue arose because Superior claimed reliance on a ruling letter issued in 1984, Ruling 553052 CW, to a third party, which was available to the public on microfiche but not published in the Customs Bulletin. In that ruling, the Customs Service held that ten-gauge wire drawn in Mexico from wire rod made in the United States would be considered a "substantially transformed constituent material" of concrete reinforcing wire mesh exported to the United States. The ruling permitted the cost or value of the transformed product to be included as part of the Mexican material or processing costs in determining whether not less than thirty-five percent of the appraised value of the imported article (concrete wire mesh) is attributable to a designated beneficiary country (Mexico) and therefore entitled to duty-free entry under the Generalized System of Preferences (GSP). *See* 19 U.S.C. §§ 2461–2465 (1982 & Supp. IV 1986); 19 C.F.R. § 10.176 (1988). Superior also claimed reliance based on the fact that Customs Service officials had followed Ruling 553052 CW in permitting Superior's Canadian drawn wire to enter the United States as a Canadian product until Ruling 075923 JVL issued.

The Court of International Trade further determined on the merits that the drawing of wire rod into wire does not substantially transform wire rod into a new product for the purpose of determining the country of origin under the VRA.[1] 669 F.Supp. at 480.

## II

The trial court's findings of fact are reviewed under the clearly erroneous standard of review. *Daw Indus., Inc. v. United States*, 714 F.2d 1140, 1142, 1 Fed.Cir. (T) 146, 148 (Fed.Cir.1983). Findings of fact may be overturned only when "the

---

**1.** Judge Restani initially ruled in favor of Superior, but after a second hearing deemed necessary to consider "the number of undeveloped relevant facts and ... numerous inconsistencies in the facts presented," she vacated the initial opinion and judgment.

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The court is not so restricted with respect to legal conclusions and will reverse those conclusions found to be in error. *Heisig v. United States*, 719 F.2d 1153, 1158 (Fed.Cir.1983).

### III

 Preliminarily we must determine whether Superior was entitled to rely on the 1984 ruling letter, and the Customs Service's admittance of its wire imports, as a "position" of the Customs Service which could be changed only after notice in the Federal Register and public comment, or whether the Court of International Trade correctly determined that the Customs Service did not change a prior "position" in issuing Ruling 075923 JLV.

Customs Service regulation 19 C.F.R. § 177.9 (1988) provides in subparagraph (a) that a ruling letter represents the official position of the Customs Service "with respect to the particular transaction or issue described therein." Subparagraph (c) of section 177.9 expressly states, however, that a ruling letter should not be relied on by other persons and they should not "assume that the principles of that ruling will be applied in connection with any transaction other than the one described in the letter." These regulations circumscribe the applicability of a ruling letter and preclude a person other than the recipient from claiming reliance on such a ruling with respect to other transactions. Further, a ruling letter may be modified or revoked if later determined to be erroneous and, except for the person to whom the ruling was addressed, the regulations do not require that notice be given of a revocation or change. 19 C.F.R. § 177.9(c) (1988).

Superior argues that Ruling 553052 CW had become a "position" of the Customs Service within the meaning of 19 C.F.R. § 177.10 (1988) because it was available to the public on microfiche and was followed

by Customs Service officials in permitting entry of its Canadian drawn wire. That regulation provides generally that any precedential decision of the Customs Service shall be published in the Customs Bulletin or otherwise made available for public inspection and that a precedential decision includes a ruling letter. Section 177.10(a) reads as follows:

> (a) *Generally.* Within 120 days after issuing any precedential decision under the Tariff Act of 1930, as amended, relating to any Customs transaction (prospective, current, or completed), the Customs Service shall publish the decision in the Customs Bulletin or otherwise make it available for public inspection. For purposes of this paragraph a precedential decision includes any ruling letter, internal advice memorandum, or protest review decision.

Section 177.10 also requires in subparagraph (c)(2) that:

> (c)(2) Before the publication of a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice that the position (or prior ruling on which the position is based) is under review will be published in the Federal Register and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change.

The Court of International Trade held that ruling letter 553052 CW had not evolved into a position of the Customs Service. 669 F.Supp. at 476. The court considered its prior decisions in *National Juice Prods. Ass'n v. United States*, 628 F.Supp. 978 (Ct. Int'l Trade 1986), and *Arbor Foods, Inc. v. United States*, 607 F.Supp. 1474 (Ct. Int'l Trade 1985). In its opinion, the court noted that *National Juice* found that a "position" did exist based on the existence of several rulings published in the Customs Bulletin that "provided a factually explicit description of a Customs position of at least eight years standing." 669 F.Supp. at 476. It further noted that *Arbor Foods* reached the opposite result where "a series of ruling letters,

oral assurances from various Customs officials, and remissions of liquidated damages claims" were held not to constitute a Customs position. *Id.* (quoting *Arbor Foods,* 607 F.Supp. at 1478). The court concluded that one ruling letter, which described a wiremaking process in Mexico constituting part of the process of manufacturing concrete wire mesh for importation into the United States and which was issued for purposes of the thirty-five percent requirement under the Generalized System of Preferences, was more like the fact pattern in *Arbor Foods* than the one described in *National Juice. Id.* On this basis, it held that the letter ruling could not be viewed as a Customs Service position. *Id.*

We are convinced that the Court of International Trade correctly held that letter ruling 553052 CW did not represent a position of the Customs Service. The applicable regulations discussed above are not a model of clarity. It is apparent, however, from the language of 19 C.F.R. § 177.9 that ruling letters are not issued by the Customs Service with the expectation that they can generally be relied upon. Rather, they are intended to apply to a specific set of circumstances. If the Customs Service determines that a specific ruling letter is to have broader applicability, then, as provided by 19 C.F.R. § 177.10, it will ordinarily be published in the Customs Bulletin. As the trial court noted, publication in the Customs Bulletin is important in determining whether the Customs Service has established a position. *See National Juice Prods. Ass'n,* 628 F.Supp. at 993–94.

Superior contends that because Ruling 553052 CW was available to the public on microfiche, it was a "published" decision and therefore should be treated as a position of the Customs Service. The ruling was available on microfiche in accordance with Customs regulations, see 19 C.F.R. § 103.0 (1988), *et seq.,* and the Freedom of Information Act, 5 U.S.C. § 552 (1982 & Supp. IV 1986). The accessibility of rulings in this manner cannot be regarded as having the same effect as publication in the official publication of the Customs Service. The Customs regulations do not provide for the inclusion of all letter rulings in the Bulletin, only those of precedential value, *see* 19 C.F.R. § 177.10(a) (1988). Moreover, the regulations explicitly provide that ruling letters are not to be generally relied on. 19 C.F.R. § 177.9(c) (1988).

The trial court also appropriately noted that Superior had the option of obtaining its own letter ruling, which would have given it the right to notice before a change. Superior did not choose this approach, but instead relied on a ruling involving different circumstances and different statutory provisions. The 1984 ruling was issued in the context of the GSP, which this court, in *Torrington Co. v. United States,* 764 F.2d 1563, 1571, 3 Fed. Cir. (T) 158, 167 (Fed.Cir. 1985), recognized was enacted for the "fundamental purpose of fostering industrialization" in beneficiary developing countries. Here, however, the VRA was intended to preclude the entry into the United States of wire and wire rod products from Spain that do not have proper export licenses. Moreover, the product being imported in the 1984 ruling on which Superior relies here was a different product, i.e., finished concrete wire mesh, and the issue was different, i.e., what portion of the value of that product should be treated under the GSP regulations of the Customs Service as of Mexican manufacture. In this case, the import was the intermediate product wire.

■ With respect to Superior's contention that it should be entitled to rely on the oral advice it received from Customs officials who, in turn, apparently followed Ruling 553052 CW in allowing Superior's wire to be imported until the issuance of Ruling 075923 JLV, the Court of International Trade correctly held that such advice and acquiescence cannot establish a Customs Service position, which would require notice and opportunity for public comment to be changed. *See Arbor Foods, Inc.,* 607 F.Supp. at 1478.

## IV

■ On the country of origin issue, Superior contends that the wire imported into the United States is a product of Canada, not Spain, because the Spanish wire rod

was "substantially transformed" in Canada. Substantial transformation requires that "[t]here must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" *Anheuser–Busch Brewing Ass'n v. United States*, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336 (1908) (quoting *Hartranft v. Wiegmann*, 121 U.S. 609, 615, 7 S.Ct. 1240, 1243, 30 L.Ed. 1012 (1887)); *accord Torrington Co.*, 764 F.2d at 1568, 3 Fed.Cir. (T) at 163. Whether such a transformation occurred involves findings of fact by the trial court. These findings may not be set aside unless clearly erroneous. "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The Court of International Trade considered the "transformation of wire rod to wire to be minor rather than substantial." 669 F.Supp. at 480. The court found that there was no significant change in use or character, but there was a change in name, *see Anheuser–Busch Brewing Ass'n*, 207 U.S. at 562, 28 S.Ct. at 206, and concluded that "wire rod and wire may be viewed as different stages of the same product." 669 F.Supp. at 479.

Although noting that "[t]he wire emerges stronger and rounder after" drawing the wire rod, the court found "[i]ts strength characteristic ... is ... metallurgically predetermined ... through the fabrication of the wire rod." 669 F.Supp. at 480. The court explained that "[t]he chemical content of the rod and the cooling processes used in its manufacture ... determine the properties that the wire will have after drawing." 669 F.Supp. at 474. These findings are "plausible" in light of the record viewed in its entirety and are not clearly erroneous. *See Anderson*, 470 U.S. at 573–74, 105 S.Ct. at 1511. There was evidence of record to show that the rod pro-

ducer determines the tensile strength of the drawn wire by the chemistry of the steel, particularly by the mix of carbon and manganese in the molten steel rods, and that the properties desired in the drawn wire dictate the selection of scrap grade.

We are not persuaded by Superior's argument that because wire is "cleaner, smoother ... and cross-sectionally more uniform" than the wire rod it has a different character. Such changes appear to be primarily cosmetic in the light of the predetermined qualities and specifications of the wire rod. *See United States v. Murray*, 621 F.2d 1163 (1st Cir.), *cert. denied*, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980).

There was also ample evidence from which the Court of International Trade could determine that there is no change in use between the wire rod and the wire. The end use of wire rod is generally known before the rolling stage and the specifications are frequently determined by reference to the end product for which the drawn wire will be used. Thus, rod used for the production of concrete reinforcing mesh is known as "mesh-grade" or "mesh-quality rod." Moreover, the evidence indicates that if the rod is produced improperly for its intended application, the wire drawing process is incapable of making the product suitable for such use.

With respect to the third of the *Anheuser–Busch* factors, the trial court noted that the two products have different names: wire and wire rod. This is the least persuasive factor and is insufficient by itself to support a holding that there is a substantial transformation. *See United States v. International Paint Co.*, 35 CCPA 87, 93–94 (1948) ("a change of name alone would not necessarily result in a product being regarded as 'manufactured or produced'"); *National Juice Prods. Ass'n*, 628 F.Supp. at 989.

The Court of International Trade also cited a number of other considerations influencing its decision that a substantial transformation had not occurred in the drawing process, including the fact that

there was "no transformation from producers' to consumers' goods ... no complicated or expensive processing," and "only relatively small value ... added." 669 F.Supp. at 480.[2]

In view of the court's findings and conclusions, we are convinced of the correctness of its decision. The drawing of wire rod into wire is, as the Court of International Trade concluded, not the manufacture of a new and different product as required by *Anheuser–Busch Brewing Ass'n,* 207 U.S. at 562, 28 S.Ct. at 206. Accordingly, Superior's wire products imported via Canada required valid export licenses under the VRA with Spain.

The judgment of the Court of International Trade is

*AFFIRMED.*

---

**2.** Amicus urges that the purposes of the VRA program are relevant to the decision on country of origin. The trial court did not rely on this factor, and we find it unnecessary to do so to affirm. Our decision should, therefore, not be understood to entirely rule out consideration of the context in which a county of origin determination must be made.